730 F.2d 306
 34 Fair Empl.Prac.Cas. 1114,
34 Empl. Prac. Dec. P 34,335
Dorothy WALLS, et al., Plaintiffs-Appellees Cross-Appellees-Appellants,
v.
MISSISSIPPI STATE DEPARTMENT OF PUBLIC WELFARE, et al.,
Defendants-Appellees Cross-Appellants,
v.
UNITED STATES of America, Defendant-Appellant Cross-Appellee.
 No. 82-4275.
 United States Court of Appeals,
Fifth Circuit.
 April 23, 1984.
Rehearing Denied May 18, 1984.
 
 Joan A. Magagna, Walter W. Barnett, Attys. Civ. Rights Div., Dept. of Justice, Washington, D.C., for the U.S.
 Johnnie E. Walls, Jr., Greenville, Miss., Alain Chirot, Eugene Martin-Leff, Englewood, N.J., for plaintiffs-appellees cross-appellants.
 Thomas E. Childs, Jr., Edwin Lloyd Pittman, Atty. Gen., Jackson, Miss., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before GOLDBERG, GEE, and TATE, Circuit Judges.
 TATE, Circuit Judge:
 
 
 1
 The private plaintiffs, members of the black race, brought suit in 1973 for themselves and as representatives of a class, alleging racial discrimination in hiring practices by the Mississippi State Department of Public Welfare ("the state Department") and its local and ancillary agencies, which had resulted in the denial of employment to black applicants on account of their race or color. The relief sought was primarily based upon violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq. In 1975, the United States also brought suit against the Department, generally presenting the same challenges to its employment practices as those asserted by the private plaintiffs. The suits were consolidated for bifurcated trial on the issue of liability only.
 
 
 2
 After nine years of this complex employment-discrimination litigation, the district court in a comprehensive opinion decided the issues thereby presented. Walls v. Mississippi State Department of Public Welfare, 542 F.Supp. 281 (N.D.Miss.1982). Pursuant to 28 U.S.C. Sec. 1292(b) certification, the private plaintiffs, the state defendants, and the United States all appeal as to separate holdings by the district court on this interlocutory determination of issues of liability.
 
 
 3
 The facts of the litigation and the reasons for the district court's holdings are set forth in detail in its excellent and lengthy opinion. Briefly, the private plaintiffs and the United States contended that the state Department's employment practices discriminated against employment of blacks in the positions of Clerk, Eligibility Worker, and Social Worker through three aspects of the Department's employment selection procedure: (1) the use of minimum educational qualifications; (2) the use of unvalidated written examinations as a prerequisite for consideration to employment; and (3) the manner in which individuals who met the above two requirements were selected for employment thereafter from "certificates of eligibles." By way of overview, the district court rejected the contention as to the educational qualifications, but it determined that declaratory, injunctive, and back-pay relief was awardable to the private plaintiffs and members of the class (a) because of the discriminatory impact of the non-validated examination process and (b) because of the disparate treatment accorded blacks in selecting appointees from the certificates of eligibles.
 
 
 4
 The three separate appeals present the following issues. The state defendants appeal these adverse determinations and in the alternative assert that, if back pay is awarded, the back pay should be paid from state-federal funding rather than from only state funding. The private plaintiffs contend that the district court erred in holding that the educational prerequisites were not proved to have discriminatory impact upon the employment of blacks. The United States appeals the district court's denial of retroactive relief for victims of discrimination, its grant of injunctive relief ordering the United States to assist in the development of new selection procedures and enjoining the United States from requiring the use of unvalidated tests, and from the district court's holding that the United States was jointly and severally liable for the private plaintiffs' costs and attorneys' fees.
 
 
 5
 For reasons to be set forth more fully below, we generally affirm the district court's determinations. However, we reverse the injunctive relief and cost/attorneys' fees awarded against the United States, and the denial to the United States of its statutory remedy to seek retroactive equitable relief for victims of discrimination.
 
 Proceedings Below
 
 6
 On January 15, 1973, five black women, Dorothy Walls, Deborah Gambrell, Marlene Johnson, Julia Collier and Emily Butler O'Bryant, filed suit for themselves individually and as representatives of a class certified as "all black persons who did, or will in the future, apply for employment in the position of Clerk (any grade), Eligibility Worker, or Social Worker (any grade) in the Mississippi State Department of Public Welfare or county departments of public welfare and who have been, or in the future may be, denied such employment or otherwise discriminated against in hiring or terms and conditions of such employment on account of race or color." Made defendants in the plaintiffs' action were the "state defendants": the Mississippi Department of Public Welfare, its Commissioner and state board members; the Merit System Council[1] (hereinafter referred to as "the state merit system agency"); and the Leflore County Welfare Department and its director. (The latter two defendants were also certified to represent defendant classes "of all county departments of public welfare in the State of Mississippi and the County Directors of all such Departments.") By court order dated August 11, 1975, the "federal defendants"[2] were included as parties necessary for just adjudication. No relief was sought by the private plaintiffs against the federal defendants.
 
 
 7
 A separate action was filed on August 28, 1975, by the United States, against the same state defendants who were sued by the private plaintiffs, alleging the same three challenges asserted in the private class action.
 
 
 8
 The state defendants in the private action cross-claimed against the federal defendants alleging that the government had required and/or encouraged use of the challenged employment procedures. Similar claims were made by the state in their counterclaim in the United States' separate suit.
 
 
 9
 Commencing on July 5, 1978, the district court conducted a nonjury trial on the liability issues. On May 18, 1982, the district court filed its memorandum opinion (542 F.Supp. 281) and entered judgment. The court found that the written examinations and selections from "certificates of eligibles" violated Title VII. The court further concluded that the use of the certificates of eligibles "violated Title VII as well as Secs. 1981 and 1983 and the fourteenth amendment." The private plaintiffs were denied standing to challenge the educational requirements and the court found that the government, in its own challenge to the educational requirement--which was tried--had failed to prove that these requirements were racially discriminatory.
 
 
 10
 The district court determined that the federal defendants were as much at fault as the state defendants for the use of the challenged tests, but that sovereign immunity precluded any judgment for monetary relief against the federal defendants. Walls, supra, 542 F.Supp. at 314. The court granted injunctive relief on the state's cross-claim against the United States, however, ordering the federal government "to withdraw as mandatory selection devices the use of unvalidated written examinations and to furnish to appropriate state officials such financial, technical and advisory assistance as may be necessary to establish valid minimum requirements for the contested positions." Id. at 316. On July 8, 1982, the district court amended its prior order to direct that federal defendants be made jointly and severally liable with the state defendants for costs, expenses, and attorney's fees. Pursuant to 28 U.S.C. Sec. 1292(b), as above noted, the private plaintiffs, the state defendants, and the United States all appeal.
 
 Facts
 
 11
 Because of the district court's excellent and meticulous recital of the factual background that precipitated this litigation, Walls, supra, 542 F.Supp. at 286-308, we will note here only the general framework of the factual record.
 
 
 12
 Selection of employees for the state Department at the time when the present cause of action arose was accomplished by the use of a multiple-stage process. This process was implemented to comply with the federal funding requirement that employment must be based on a merit system of personnel selection. 45 C.F.R. Secs. 70.1 et seq. (1948, 1963, 1971). (The United States Civil Service Commission audited the state merit system agency and the state Department to insure compliance, periodically conducting on-site inspections of the operation of those agencies.)
 
 
 13
 During the time period at issue in this case, the same general hiring procedure was followed for the three contested positions of Clerk, Eligibility Worker, and Social Worker.[3] Applications were first submitted to the state merit system agency, which screened the applicants for educational prerequisites. Applicants who met the minimum education requirements[4] were permitted to take a written examination. The names of those applicants who scored fifty percent or better on the written examination were then placed on a statewide register in rank order according to their test scores. When a vacancy became available, a county director requested the merit system issue a certificate of eligibles, which as prepared by the agency was generally limited to the five applicants desiring employment in that county who had received the highest scores.[5] Walls, supra, 542 F.Supp. at 287. After interviewing the applicants, the county director returned the certificate of eligibles, together with written evaluations and recommendations, to the state welfare commissioner, who made the formal selection, but who usually if not invariably[6] followed the county director's recommendation. Id.
 
 The Issues on Appeal
 
 14
 The issues raised by the appeals in the consolidated suits will be treated as follows: I. The Educational Requirements (raised by the private plaintiffs' appeal); II. Written Examinations, and III. Certificates of Eligibility (both issues raised by the state defendants' appeal); IV. Federal Liability for Back Pay (with reference to a contention on the state defendants' appeal); V. Denial of Statutory Remedy of the United States (to recover back pay and other relief for discrimination victims) (an issue raised by the United States on its appeal), VI. Injunction Against United States (raised by the United States' appeal); and VII. Costs and Attorneys' Fees (raised by the appeal of the United States).I. The Educational Requirements
 
 
 15
 The suits by both the private plaintiffs and the United States attacked the minimum educational qualifications for the three positions at issue (see note 4 supra ) as discriminatory to blacks. The issue was fully tried. However, in its memorandum opinion, the district court found that the named plaintiffs lacked standing to assert this claim as class representatives since "each named plaintiff satisfied the educational qualifications for the position(s) for which she applied." Walls, 542 F.Supp. at 309. (The private plaintiffs appeal this ruling.) However, with regard to the merits of the United States' claim as to the same issue, the district court found "that the educational requirement has not been shown to produce a disparate impact upon minority applicants" and that "the reduced number of blacks" selected by the state Department "is the result of other practices having no relationship whatsoever to educational requirements." Walls, 542 F.Supp. at 310.
 
 A. Standing of Private Plaintiffs
 
 16
 Although four of the named plaintiffs did possess the educational requirements at all pertinent times, the plaintiff Gambrell's application to take the examination for social worker was rejected in 1971 because she lacked the educational requirements. She completed the educational requirements in May, 1972, before suit was filed on January 15, 1973. The defendants rely on Payne v. Travenol Laboratories, Inc., 565 F.2d 895, 898 (5th Cir.1978), where the plaintiffs "had fulfilled the [educational] requirement prior to submitting applications" for employment. Id. Here, however, Ms. Gambrell as named plaintiff had been denied an opportunity for employment at the time she applied for employment because she lacked the (allegedly discriminatory) educational requirement.
 
 
 17
 Gambrell asserts a claim for monetary damages due to the allegedly wrongful denial of employment opportunity to her because of the allegedly discriminatory educational requirement. The Supreme Court has recognized that a cause of action for monetary damages is not lost by a cessation of the original violation. Powell v. McCormack, 395 U.S. 486, 495, 496, 89 S.Ct. 1944, 1950, 1951, 23 L.Ed.2d 491 (1969). Likewise, standing to sue for accrued monetary damages is not lost because the injury has abated at the time the complaint is filed. A party who was denied employment because of an educational requirement which she has subsequently met, has no less stake in the litigation for the deprivation which occurred prior to obtaining her degree, even though injunctive relief might be mooted. To conclude that a party who meets an educational prerequisite at the time the complaint is filed does not have standing to litigate an injury earlier caused by the requirement would mean that an aggrieved party would need to discontinue her educational pursuits, at least until the moment suit is filed. We believe that the district court overlooked these principles in erroneously holding that Ms. Gambrell did not have standing to assert the educational claim on her individual and class behalf.[7]
 
 
 18
 B. Disparate Impact of Educational Requirements
 
 
 19
 Nevertheless, although we find that the class plaintiffs have standing to raise the issue on appeal, we also find no error in the district court's holding that the educational requirements had no disparate impact on blacks. The issue was fully tried below and was decided in the consolidated suits adversely to the identical contentions of the private plaintiffs and of the United States.
 
 
 20
 In the United States' challenge in the trial court, the district court held that the educational requirements were not shown to produce a disparate impact upon minority applicants. Walls, supra, 542 F.Supp. at 310. Instead, the district court attributed the reduced number of blacks selected by the state Department to "other practices having no relationship whatever to educational standards." Id. The court reasoned that the mere census data (now relied upon by the private plaintiffs) that indicated that fewer blacks than whites possess the challenged educational requirement[8] was not sufficient to show disparate impact absent the further showing that the disparity of blacks in the workforce was directly caused by the educational barrier and not by other factors. Id.
 
 
 21
 As this court recently held in Carpenter v. Stephen F. Austin State University, 706 F.2d 608, 623 (5th Cir.1983), on appellate review the standard we apply is whether the district court clearly erred in finding whether the plaintiff class established a prima facie factual case of adverse impact of the educational requirement and whether the defendant had successfully rebutted factually the plaintiff's case. In order to prove disparate impact in a Title VII class action, the plaintiff class must set forth discrete, facially neutral employment practices that operate more harshly on one group than another. See Griggs v. Duke Power Company, 401 U.S. 424, 431-33, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). See also Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977) (height and weight requirement). Once the plaintiff has made out a prima facie case, the burden is then upon the employer to prove that an employment practice which operates to exclude a protected class is related to job performance. Carpenter, supra, 706 F.2d at 621.
 
 1. Prima Facie Case
 
 22
 In Carpenter, the plaintiff class presented data showing that 47% of whites and 24.8% of blacks had high school degrees. See also Griggs, supra, 401 U.S. at 430 n. 6, 91 S.Ct. at 853 n. 6. The court then determined that the racial composition (80% white) of the employees in jobs requiring a high school diploma exhibited the harshly disproportionate impact of the requirement on blacks. Carpenter, supra, 706 F.2d at 622. The court rejected the University's "bottom-line" defense, i.e., because a large number of blacks survive the selection device, a requirement is not racially discriminatory. Id., citing Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 2533, 73 L.Ed.2d 130 (1982). Finally, the Carpenter court found that the employer had failed to present any specific evidence of job relatedness.[9]
 
 
 23
 The Walls plaintiffs adequately established a prima facie case of discrimination. The educational requirement barred more blacks than whites from seeking employment with the state Department (see supra note 7). The racial composition of classified positions requiring the educational minimums was primarily white--in January 1973, when private plaintiffs filed their action, 32 of the state Department's 84 county offices did not employ a black, while 20 other county offices had a black employed only in the position of "homemaker." Walls, supra, 542 F.Supp. at 290. The following table depicts the number and percentages of blacks and whites hired from 1972-75.
 
 
 24
 WELFARE DEPARTMENT HIRES IN CONTESTED CLASSES
---------------------------------------------------------------
 Total SWI EW CTI-III
 Years Total # % W % B % W % B % W % B % W % B
----------- -------- --------- -------- -------- ---------
1972, 1973
 & 1975 1,291 90 10 92 8 90 10 91 9
1973 & 1975 943 89 11 90 10 88 12 90 10
 
 
 25
 This showing--that over 85% of the jobs requiring an educational minimum were held by whites--indicates (as it was also so found in Carpenter, supra, 706 F.2d at 608) the "harshly disproportionate impact of the requirement on blacks."
 
 2. Job Relatedness
 
 26
 However, unlike the defendant employer in Carpenter, who failed to present any specific evidence of job relatedness, the state defendants here did seek to justify the use of the requirements by presenting evidence at trial that the educational requirement bears "a demonstrable relationship to successful performance of the jobs for which it was used." Griggs, supra, 401 U.S. at 431, 91 S.Ct. at 853. See Carpenter, supra, 706 F.2d at 622. The district court related the testimony of the Mississippi Civil Service Commissioner Cole as to why he felt the minimum prerequisites were necessary for successful job performance. Walls, supra, 542 F.Supp. 291-92.
 
 
 27
 Commissioner Cole testified as to the duties of the respective classifications and the job-related necessity for the minimum educational requirements:
 
 
 28
 Social Workers handle child neglect and abuse cases, as well as aid to adults, and are thus required to work closely with individuals involved in sensitive situations. Social Workers develop written plans and goals for their clients and must furnish written reports of their actions to supervisors. Cole expressed his strong belief that "every Social Worker should have a college degree" in order to perform these duties, so as to afford their welfare clients better treatment and more prompt service. (Social Workers are also required to understand and apply government regulations.)
 
 
 29
 Eligibility Workers interview and assist clients who apply for government assistance. Their duties require knowledge of various federal regulations and policies and alternative avenues of benefits. Eligibility Workers receive on-the-job training to acquaint them with the various procedures they must follow. In Cole's opinion, the present minimum education requirement for Eligibility Worker (two years of college credit) is probably inadequate due to the requirements of reading, understanding, and applying the complex federal regulations, as well as because of the interpersonal contact necessitated by the job.
 
 
 30
 Clerk/Typists function as receptionists and are required to fill out data cards on clients, transcribe interviews, and perform typing and filing duties. A high school diploma is a realistic minimum because the clerk must have a good English background and be a skilled typist. Moreover, the Clerk often is required to assume control of the office in the absence of a more superior employee.
 
 
 31
 The plaintiffs did not contradict the Commissioner's description or assessment of the work performed by these department employees.
 
 
 32
 Although we might have preferred more definitive evidence of job relatedness than the testimony of the Mississippi state officials at trial, we are unable to say that the district court was clearly erroneous in determining that the educational requirements were job-related and thus were not racially discriminatory, and that the sparsity of blacks in the contested positions was the result of other practices having no relationship to educational standards.
 
 II. Written Examinations
 A. Statutory Standing
 
 33
 The state defendants contend that the private plaintiffs lacked statutory standing under 42 U.S.C. Sec. 2000e, et seq. to challenge the written examinations because the state's Merit System Council, which administered the tests, was not charged in the plaintiffs' complaint filed with the EEOC. In their initial EEOC charges, Walls and Gambrell named "The Department of Public Welfare, W Market Street, Greenwood, Miss." or "The Department of Public Welfare," listing a Greenwood address, as the party responsible for disparate treatment in selections from certificates of eligibles. The state defendants also argue that because the examinations were not the subject of the EEOC charges, the plaintiffs failed to comply with the statutory prerequisite for a federal court action.[10]
 
 
 34
 Citing General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 380, n. 4, 102 S.Ct. 3141, 3144, n. 4, 73 L.Ed.2d 835 (1982),--where the Court had observed in passing that an aggrieved employee had sued only the union and a joint apprenticeship committee but had not joined the employer in its Title VII complaint because it had not filed an EEOC charge against the employer--the state Department apparently contends that the failure to join the state Department and its Merit System Council rather than (as construed by this defendant) only a local branch is a jurisdictional bar to the private plaintiffs' suit against the state defendants, the Department and its Merit System Council, a division thereof (see note 1 supra ).
 
 
 35
 We do not read the EEOC charges as narrowly as does the state Department. We think the complaint, liberally construed as required, was to hiring practices of the entire state agency (including its Merit System Council), not just the local Greenwood office. See Jackson v. Seaboard Coast Line Railroad Company, 678 F.2d 992, 1010 (11th Cir.1982) (only union local, not national union sued, named in the EEOC charge).[11] Further, despite the Department's argument that the initial EEOC charges did not implicate charges of discrimination with regard to the examination itself rather than (as argued) only the selections from the certificates of eligibles, we are unable to read the substance of the charges so narrowly.[12]
 
 
 36
 Moreover, this circuit has held that a Title VII suit may be based, not only upon the specific allegations in the employee's initial charge, but also upon "any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." Fellows v. Universal Restaurants, Inc., 701 F.2d at 447, 451 (5th Cir.1983). In this case, the EEOC determined after investigation of the two charges that there was reasonable cause to believe that the Mississippi State Department of Public Welfare had engaged in unlawful employment practices. (Exhibit P-125.) The determination specifically stated that, following the charges, it had investigated complaints of discrimination against blacks because of their race "with respect to recruitment, hiring," and other discriminatory practices, and it included a summary of the Department's "general employment procedures," such as a description of the selection process from registers of eligibles provided by the Merit System Council, the use of unvalidated pen and pencil tests that had disproportionately affected blacks adversely in eligibility for the registers, and the disproportionate subjective choice by the county directors of whites over blacks with equivalent or higher scores. The determination stated that the EEOC had secured from the state Department, specifically named as "respondent" to the charges, "documentary evidence relating to its hiring and employment policies and practices," and that, additionally, an EEOC investigator had secured statements from "various of Respondent's county directors."
 
 
 37
 Under the settled jurisprudence of this court, the liberally construed initial discrimination charges to the EEOC specifically implicated the state Department (including its Merit System Council division) and reasonably implicated the state Department's entire initial selection process (including testing and subjective selection from the certificates of eligibles) as within the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination. Fellows, supra, 701 F.2d at 451-53; Terrell v. United States Pipe & Foundry Co., 644 F.2d 1112, 1123-24 (5th Cir.1981), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); Tillman v. City of Boaz, 548 F.2d 592, 592 (5th Cir.1977). We thus find no merit to the state Department's contention that the private plaintiffs lacked statutory standing.
 
 B. Constitutional Standing
 
 38
 The state Department contends that, with regard to the alleged misuse of the unvalidated examinations, the private plaintiffs lack Article III case-or-controversy standing because they themselves are not threatened with actual injury and have no personal stake in the litigation. See O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 674, 38 L.Ed.2d 674 (1974). The Department points out that Walls and Gambrell, who filed the EEOC charges, had passed the examination in October 1971, prior to the date (March 24, 1972) that Title VII was made applicable to the States. Although the test results are used to determine eligibility for two years from their date of score, the state Department argues that this continuing effect does not constitute a present violation, being rather only a present non-actionable effect of a past illegal act. Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980).
 
 
 39
 The plaintiffs argue that they were adversely affected by the continuous use of the allegedly invalid test results, since their ranking by these tests was determined in certificates of eligibility for vacancies after March 24, 1972 (the date the Title VII applied to the States), and thus both their eligibility for consideration and their ranking on the eligibility certificates was continuously affected by the 1971 tests as to vacancies occurring in 1972 and 1973.
 
 
 40
 Two decisions of other circuits cited to us are possibly divided on the viability of the continuing violation theory of standing as applied to the use of eligibility lists subsequent to the administration of an examination, although perhaps they may be reconciled in the light of the specific issues presented therein. The Third Circuit has held that "the use of [an] eligibility roster does not constitute a continuing violation." Bronze Shields, Inc. v. New Jersey Department of Civil Services, 667 F.2d 1074, 1082 (3rd Cir.1981), cert. denied, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982) (where, however, the court held that the only act charged was the time-barred promulgation of the eligibility list, followed by its non-discriminatory use thereafter, 677 F.2d at 1084). The Second Circuit, conversely, maintains that "the results of the tests were in effect being 'used to discriminate,' in direct contravention of Sec. 703(h) of Title VII, each time a member of the plaintiff class was denied a chance to fill a vacancy." Guardian Association of New York City v. Civil Service Commission of the City of New York, 633 F.2d 232, 249 (2nd Cir.1980), cert. denied, --- U.S. ----, 103 S.Ct. 3568, 77 L.Ed.2d 1410 (1983) (where not the compilation of the list, but the wrongful denial of employment based thereupon was charged).
 
 
 41
 The district court found that the ranking, which was based upon performance on the written examinations, resulted in adverse consequences after March 24, 1972. Walls, supra, 542 F.Supp. at 311. Both plaintiffs Walls and Gambrell appeared on a certificate of eligibles in August 1972 and were denied employment in favor of a white person whose name appeared at the top of the register. Id. The examination determined the plaintiffs' ranking, which ranking was a material factor in the subjective selection process employed by the state Department. The district court did not err in finding that, because of the adverse consequences suffered by the plaintiffs in 1972 and thereafter as a result of the 1971 examination, they had constitutional standing to challenge the discriminatory impact of the written examinations.
 
 C. Adverse Impact of Examinations
 
 42
 Title VII proscribes not only overt discrimination, but also tests or criteria for employment that are fair in form, but discriminatory in effect. Griggs, supra, 401 U.S. at 430, 91 S.Ct. at 853. The ultimate question of the existence of discriminatory impact is a factual one for the district court, only to be disturbed if found on appeal to be clearly erroneous. Equal Employment Opportunity Commission v. Kimbrough Investment Company, 703 F.2d 98, 100 (5th Cir.1983). See Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).
 
 
 43
 Despite the state Department's strong protestations to the contrary on appeal, the district court concluded that "defendants do not seriously argue that the contested examinations did not have a disparate impact on blacks, and we here find conclusively that plaintiffs established a marked disparate impact of testing on blacks," Walls, supra, 542 F.Supp. at 311. We see no need to reiterate the detailed analysis and findings by the district court. We will simply state that the evidence in the records supports as non-erroneous the district court's findings as to: (1) the disparate effect of the examinations upon black applicants, Walls, 542 F.Supp. at 293-94, see also Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982); (2) the deficiencies in their content validity (relationship of the testing items to the knowledge/skills/abilities of an applicant at entry for successful performance of job duties),[13] id., 542 F.Supp. at 294-98; 312-13; and (3) the deficiencies in their criterion validity (the relationship between test scores and job performance), id. 298-300, 312-13.
 
 
 44
 Aside from differing with the district court's factual appreciation of the evidence on these issues, on appeal the state Department also strongly contends that the determination of racially discriminatory impact upon blacks is suspect because it is based upon a single six-month period. The state Department did not keep records identifying the race of job applicants prior to May 1975, when the district court granted the private plaintiffs' motions to extend discovery and to permit entry at merit system examination centers. The state defendants were then ordered to monitor and prepare lists of applicants by race. Only the six subsequent months of test data were studied because this was all that was available. The district court noted that the Department's employee composition indicated that no real gains in minority employment were made until 1976, after total suspension of the written examinations, Walls, supra, 542 F.Supp. at 289, suggesting that the tests had a similar impact throughout the period in question. Under the circumstances shown, we do not find to be clearly erroneous the district court's utilization of and findings based upon the only available test data.
 
 
 45
 The state Department also contends that the district court erred in holding that the plaintiffs could proceed under the "disparate impact" theory. The defendants instead seek to invoke the protection of Sec. 703(h) of Title VII, 42 U.S.C. Sec. 2000e-2(h), by arguing that the tests were part of a "merit system" that required proof of intent in order to be deemed discriminatory. However, in Connecticut v. Teal, supra, 457 U.S. at 452, 102 S.Ct. at 2533, the Supreme Court ruled that no "special haven for discriminatory tests" that are not job-related is offered the employer by Sec. 703(h). The district court, therefore, properly rejected the defendants' claim to "merit system exemption," on the grounds that unlike a seniority system "which indisputably measures seniority, an invalid test cannot measure merit." Walls, supra, 542 F.Supp. at 311. See Guardians, supra, 633 F.2d at 253.
 
 D. Immunity of State
 
 46
 The trial below was on the bifurcated issue of liability, with damages to be determined, if liability was thereby found, in subsequent proceedings. The district court found, inter alia, that the state Department was presumptively liable for back pay to a redefined subclass of black applicants to the positions at issue who were discriminated against by failing or by the Department's other use of the written examinations between March 24, 1972 (when Title VII became applicable to the States) and December 1, 1976 (when the state defendants ceased using the examinations results for employment purposes). Walls, 542 F.Supp. at 316.
 
 
 47
 On appeal, the state Department re-urges an immunity defense to the back-pay claim, which was raised in the trial court; it was not passed upon by the district court, probably because the court felt that consideration of this issue properly awaited determination in the damages phase of the litigation. The immunity defense raised was based upon the EEOC guidelines in effect at all times pertinent to this litigation, 29 C.F.R. Sec. 1607.9 (1970), which "authorized provisional use of tests, pending new validation efforts, in certain very limited circumstances." Albemarle Paper Company v. Moody, 422 U.S. 405, 436, 95 S.Ct. 2362, 2380, 45 L.Ed.2d 280 (1975).
 
 
 48
 The limited issue posed by the state Department's contention, raised in this appeal from a determination of liability vel non only, is whether by reason of 29 C.F.R. Sec. 1607.9 (1970), it is totally immune for back pay to claimants aggrieved by the discriminatory examination process between March 24, 1972 and December 1, 1976. The cited guideline, Sec. 1607.9,[14] authorizes provisional use of tests as to which (a) there is "substantial evidence of validity" and (b) there are "in progress validation procedures." Here, construed most favorably (for present purposes) to the state Department, as found by the district court, the Department's merit system director was aware as early as 1971 that the tests had a disparate effect on blacks,[15] but not until May 1973 did the Department contact federal officials regarding a validation study.[16] Walls, 542 F.Supp. at 292.
 
 
 49
 On the record before us, therefore, we cannot say that the district court erred in failing to reach the Sec. 1607.9 immunity issue (rather, deferring its resolution until the damage (back-pay) phase of the trial). Pretermitting other reasons, the evidence shows, as found by the district court, that not until May 1973 were attempts at validation proceedings arguably set in motion by the state Department as to the tests it utilized for appointment purposes that, to its knowledge since 1971, had discriminatory impact upon black applicants. Under the showing so far made, thus, the state Department could not as to examination-infected appointments made prior to at least May 1973 claim any good-faith reliance, Sec. 713 of Title VII, 42 U.S.C. Sec. 2000e-12, upon the EEOC guideline, 29 C.F.R. Sec. 1607.9, which, inter alia, requires as justification for provisional use of unvalidated tests that there are "in progress validation procedures which are designed to produce, within a reasonable time, the additional data required." Id.
 
 
 50
 Accordingly, we, like the district court, do not find it necessary to reach the state Department's Sec. 1607.9 defense at this stage of the litigation.
 
 III. Certificates of Eligibility
 
 51
 The use of subjective criteria to evaluate employees in hiring is analyzed, not under the disparate impact model, but instead under the disparate treatment model. Vuyanich v. Republic National Bank of Dallas, 723 F.2d 1195, 1201-02 (5th Cir.1984); Carroll v. Sears, Roebuck & Company, 708 F.2d 183, 188 (5th Cir.1983). To prove disparate treatment, the plaintiffs must prove discriminatory intent and demonstrate more than "the mere occurrence of isolated or accidental or sporadic discriminatory acts." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977); Carroll, supra, 708 F.2d at 190. The plaintiffs are therefore required to establish by a preponderance of the evidence that racial discrimination was the Mississippi department's "standard operating procedure--the regular rather than the unusual practice." International Brotherhood of Teamsters, supra, 431 U.S. at 336, 97 S.Ct. at 1855.
 
 
 52
 The district court found ample evidence of intentional discrimination in the Mississippi Department's procedure of subjective selection of appointees from the certificates of five test-ranked eligibles provided for each vacancy.
 
 
 53
 Discriminatory intent may be established by either direct or circumstantial evidence. Page v. U.S. Industries, Inc., 726 F.2d 1038, 1045 (5th Cir.1984). Statistical evidence may be used in a disparate treatment case to prove both motive and a pattern or practice of racial discrimination if gross statistical disparities in the composition of an employer's work force can be shown. Pouncy v. Prudential Insurance Company of America, 668 F.2d 795, 802 (5th Cir.1982). To the extent that statistical proof is not sufficiently strong, the plaintiff's prima facie case cannot be made without additional evidence of the defendant's intentional discrimination. Id.; Vuyanich, supra, 723 F.2d at 1201-02.
 
 
 54
 In the present case, the trial court considered a statistical analysis performed by the plaintiffs' expert statistician, Dr. Peter Kolesar, together with evidence of the paucity of blacks employed in the contested positions, and the anecdotal evidence of eight black individuals who had unsuccessfully applied for Department positions. Walls, supra, 542 F.Supp. at 314. The court found that the plaintiffs successfully made out a prima facie case upon proof that the state Department treated some people less favorably than others because of their race, and that the defendants had not successfully shown that the statistics relied on by the plaintiffs were either "inaccurate or insignificant." Walls, supra, 542 F.Supp. at 315; see also International Brotherhood of Teamsters, supra, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854-55, n. 15.
 
 
 55
 The statistical proof adduced at trial amply portrays gross disparities between black and white hiring. On mixed certificates of eligibility, 37% of whites appearing were hired, while 18% of blacks were offered employment. On all-white certificates, 78.4% of the applicants were appointed, compared to only 35.7% on all-black certificates. Walls, supra, 542 F.Supp. at 314.[17]
 
 
 56
 Moreover, the court did not limit its inquiry to the statistical data, but combined that with both historical and anecdotal evidence to draw a composite picture of the racial biases manifest from the subjective selections by county directors from certificates of eligibles.
 
 
 57
 We find, therefore, that the district court was not clearly erroneous in finding that the totality of evidence indicates that the state Department subjected applicants to disparate treatment in violation of Title VII in making selections from certificates of eligibles.
 
 IV. Federal Liability for Back Pay
 
 58
 In addition to supporting the private plaintiffs' arguments in II and III, supra, the United States as cross-appellee further contends that the district court properly rejected the state Department's argument that the federal defendants should pay from federal funds part or all of any back pay awarded to the private plaintiffs. The district court found that "the United States was as much at fault in encouraging the use of its tests as were the state officials in accepting the federal examinations at face value, yet the doctrine of sovereign immunity precludes any judgment for monetary relief against the federal defendants." By their appeal, the state Department contests this holding.
 
 
 59
 The United States has waived its sovereign immunity under Title VII only where there is a direct employer-employee relationship or where an application for employment with a federal agency is involved. Sec. 717, 42 U.S.C. Sec. 2000e-16(a). Although back pay awards are "payable by the employer", Sec. 706, 42 U.S.C. Sec. 2000e-5(g), the United States is explicitly excluded from the Title VII definition of an employer, Sec. 701, 42 U.S.C. Sec. 2000e(b), and thus from Title VII liability to employees other than of its own agencies, regardless of its role in partially funding the state welfare program. (The district court found that about 75% of the state Department's funding is received from federal sources. Walls, 542 F.Supp. at 286.)
 
 
 60
 The state Department, which unsuccessfully sought federal contribution in the district court upon another theory, now suggests two other bases for requiring federal contribution: (a) the negligent breach of a supervisory duty, citing Block v. Neal, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) (Gray brief, filed April 18, 1983, pp. 15-18), which concerned the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80; and (b) the breach of an implied contract of which the private plaintiffs are third party beneficiaries, by reason of which, it is argued, The Tucker Act, 28 U.S.C. Sec. 1346 affords jurisdiction (Red brief, filed February 25, 1983, pp. 45-48.) Without detailed discussion, we will simply state, as to (a), no supervisory duty is shown by the evidence (aside from other reasons to reject this belatedly advanced claim), and, as to (b), the evidence fails to show any express or implied contract between the United States and the state Department that would give rise, upon its breach, to a claim against the United States for back wages to the state Department's employees, in the face of the cited provisions of Title VII that exclude such liability. See Army and Air Force Exchange Service v. Sheehan, 456 U.S. 728, 102 S.Ct. 2118, 2124-26, 72 L.Ed.2d 520 (1982).
 
 
 61
 V. The Denial of the Statutory Remedy of the United States
 
 
 62
 On its appeal, the United States contends that the district court erred in refusing, on an "unclean hands" theory, Walls, 542 F.Supp. at 314, 316, to grant its prayer for equitable retroactive relief, sought by the United States pursuant to statutory authority.
 
 
 63
 As noted earlier, consolidated with the 1973 suit by the private plaintiffs is the 1975 suit by the United States, alleging the same discriminatory practices of the state defendants and seeking the same relief. The public action was brought by the Attorney General on behalf of the United States, as authorized by statute, Title VII, Sec. 707(e), 42 U.S.C. Sec. 2000e-6(e) (1976). As the district court recognized, the United States is ordinarily entitled to recover back pay and other retroactive equitable relief for victims of discrimination, when it prevails in a Title VII pattern and practice suit. United States v. Georgia Power Company, 474 F.2d 906, 919 (5th Cir.1973). In such pattern and practice public actions, the standards for awarding retroactive relief are the same as the standards developed in the jurisprudence awarding such remedy against private employers for the same discriminatory conduct. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 363-67, 97 S.Ct. 1843, 1868-71, 52 L.Ed.2d 396. Thus, as held in one of its decisions there cited by the Court, Albermarle Paper Company v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975),
 
 
 64
 given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.
 
 
 65
 In Albermarle, the Supreme Court also noted the appellate court's role in reviewing back pay awards or denials: "The courts of appeals must maintain a consistent and principled application of the back pay provision, consonant with the twin statutory objectives [eradicating discrimination and making discriminatees whole], while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." Id.
 
 
 66
 The district court, while recognizing these principles, held that the government should not recover equitable retroactive relief (which seems essentially to concern back pay for discriminatees) because it did not "come into court with clean hands," Walls, 542 F.Supp. at 314, because it was a source of examination materials used and "was as much at fault in encouraging the use of its tests as were the state officials in accepting the federal examinations at face value." Id. The district court also determined that back pay relief for discriminatees aggrieved at the certificate of eligibles stage was "unnecessary" because "the rights of these individuals will be adequately protected by private plaintiffs in the companion suit." 542 F.Supp. at 316.
 
 
 67
 On its appeal, the United States argues that the district court erred in denying it the retroactive equitable relief it was statutorily entitled to obtain on behalf of victims aggrieved by a pattern and practice of discrimination. The United States concedes that essentially the same equitable retroactive relief it seeks will be awardable in the private plaintiffs' class action, under the district court's holdings (that we affirm). To some extent, then, the issue is pragmatically merely academic. Nevertheless, the government argues, it should not be denied the statutory remedy to which it is entitled in this regard--admitting that no greater (or double) recovery can eventuate--, if only to "insure that full relief for all victims of discrimination would be available in the government's suit if, for some reason, relief in the class action proved inadequate." (Blue brief, filed Jan. 12, 1983, p. 25).
 
 
 68
 The United States' legal position is well-founded. Under well-settled doctrine, the United States cannot be estopped from enforcing a public right or protecting a public interest by the prior actions or neglect of its officers or employees that assent to what the law does not sanction or permit. Hicks v. Harris, 606 F.2d 65, 68-69 (5th Cir.1979) (citing many decisions). The broad statutory purposes of Title VII in authorizing the United States by public actions to end patterns and practices of discrimination and to secure redress for victims thereof cannot, under this doctrine, be forfeited, and the victims of discrimination prejudiced, by the "unclean hands" of federal employees who allegedly contributed to the discriminatory practices and injuries.
 
 
 69
 Accordingly, the district court erred in denying the United States the right to obtain retroactive equitable relief in its Title VII suit, and its judgment will be in that regard reversed.
 
 VI. Injunction Against the United States
 
 70
 The United States also appeals the injunction against it entered on the cross-claim and counterclaim of the state defendants by which specified federal agencies were enjoined (1) to withdraw as a mandatory selective device the use of unvalidated written examinations, and (2) to furnish financial, technical, and advisory assistance to the state defendants as may be necessary to re-establish valid minimum requirements for the contested positions, Walls, 542 F.Supp. at 316. The United States appeals both aspects of injunctive relief ordered against it.
 
 
 71
 As to (1)(Withdrawal of mandatory use of written examinations):
 
 
 72
 The record shows that the use of written examinations for employment selection in federally-financed state welfare agencies has not been required since 1970. 542 F.Supp. at 293. The record does not show that reimposition of this former requirement is contemplated. In fact, the testing requirement had been withdrawn some eleven years prior to entry of the injunction against the United States in 1982.
 
 
 73
 Ordinarily, a court may not enjoin conduct that is neither threatened nor imminent. Congress of Racial Equality v. Douglas, 318 F.2d 95, 100 (5th Cir.1963). While the court's power to grant injunctive relief may survive discontinuance of the illegal conduct in order to prevent future wrongdoing, United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897-98, 97 L.Ed. 1303 (1953), "the necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility." Id.
 
 
 74
 Under the showing made that the United States had abandoned the mandatory requirement now enjoined even prior to the present litigation, and in the total absence in the record of any threat of a recurrence of mandating the requirement, the district court, in our opinion, abused its discretion by granting the " 'stringent judicial remedy of injunctive relief' " against reimposition of a long-abandoned federal requirement. See Meltzer v. Board of Public Instruction of Orange County, 548 F.2d 559, 568 (5th Cir.1977), on reh. 577 F.2d 311 (5th Cir.1978) (en banc), cert. denied, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979).
 
 
 75
 As to (2) (Injunction requiring federal agencies to assist in development of new selection procedures):
 
 
 76
 The district court also enjoined the federal Departments of Health and Human Services and Agriculture, and the Chairman of the federal Civil Service Commission, to furnish to appropriate state officials such financial, technical, and advisory assistance as may be necessary to establish valid, minimum requirements for the contested positions. The United States contends that the district court's equity powers could not, under the circumstances shown, be so exercised.
 
 
 77
 In General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), decided subsequent to the present district court's order below, the Court had before it an injunction issued by a district court under its traditional equitable powers that required some defendant contractors and trade associations to contribute to the costs of a remedial decree. The racial discrimination that was found related to hiring practices and apprenticeship programs conducted by a labor union in connection with furnishing employees for the codefendant employers. The defendant employer parties, however, had themselves been free of liability for damages arising out of racial discrimination. In reversing the issuance of the injunction, the Court found that the district court's equity powers could not "support ... the imposition of injunctive relief against a party found not to have violated any substantive rights of respondents." 458 U.S. at 399, 102 S.Ct. at 3154.
 
 
 78
 The Court noted that its jurisprudence had recognized " 'fundamental limitations on the remedial powers of the federal courts' ", and that such powers "could be exercised only on the basis of a violation of the law and could extend no further than required by the nature and extent of the violation." Id. The Court framed the question before it: "The issue before us, therefore, is whether a party not subject to liability for violating the law may nonetheless be assessed a proportionate share of the costs of implementing a decree to assure nondiscriminatory practices on the part of another party which was properly enjoined." 458 U.S. at 398, 102 S.Ct. at 3154.
 
 
 79
 The Court concluded that "[a]bsent a supportable finding of liability, we see no basis for requiring the employers or the associations to aid either in paying for the cost of the remedial program as a whole or in establishing and administering the training programs." 458 U.S. at 400, 102 S.Ct. at 3155.
 
 
 80
 The holding in General Building Contractors is determinative of the issue before us. We have previously affirmed the present district court's holding that the United States and the federal defendants could not under Title VII be held liable to contribute to remedial back-pay awards that may be assessed against the state Department employer, see Part IV of this opinion supra, and the same reasoning likewise prevents imposition under Title VII of federal liability for other remedial measures ordered of the state parties as employing agencies. Thus no supportable basis exists for the federal parties' liability under Title VII, nor is any such basis of liability shown as based upon any other statute or regulation. The requirement that the federal parties contribute to the remedial costs to be incurred by the state employing agencies, therefore, just as that imposed by the district court in General Building Contractors, essentially rests upon the traditional equitable powers of the district court.
 
 
 81
 So based, the injunction cannot stand. Under General Building Contractors, a party not substantively liable for discrimination cannot be required to contribute to the costs of implementing a decree to assure nondiscriminatory practices on the part of another party. Accordingly, we reverse the injunctive decree against the federal agencies in these respects also.
 
 VII. Costs and Attorneys' Fees
 
 82
 The United States also appeals the district court's order that the federal defendants be held jointly and severally liable with the state defendants for the private plaintiffs' costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412(a) and (b).[18] The statute authorizes such an award to a "prevailing party" in any civil action brought by or against the United States unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. Id. Pretermitting whether the private plaintiffs prevailed against the United States, we nonetheless find that attorneys' fees and costs were improperly assessed against the federal defendants under the Equal Access to Justice Act.
 
 
 83
 The Act directs that attorneys' fees and costs shall be awarded against the United States to a prevailing party unless the government's "position ... was substantially justified." Whether the government's "position" is its litigation posture only or instead includes also its prelitigation actions--a test as to which this circuit has as yet taken no position, see Knights of the Ku Klux Klan v. East Baton Rouge School Board, 679 F.2d 64, 68 (5th Cir.1982), and which we need not here decide--the United States' position was substantially justified and prevents the imposition of attorneys' fees under the Equal Access to Justice Act.
 
 
 84
 In the suit brought by the United States, it essentially prevailed in obtaining declaratory and injunctive relief in ending discriminatory practices by the state defendants. In the suit by the private plaintiffs, the federal defendants were added to the litigation as necessary parties by order of the court. Throughout the litigation, the private plaintiffs have never sought relief against the federal defendants. Even had the state defendants been afforded any relief against the United States, the United States' position resisting state-sought liability on novel theories could not be characterized other than as substantially justified.
 
 
 85
 We reverse, therefore, the order of the district court that held the federal defendants jointly and severally liable for costs, including attorneys' fees and expenses, with the state defendants.
 
 Conclusion
 
 86
 For the reasons assigned, therefore, we AFFIRM the judgments of the district court in the consolidated suits below, except:
 
 
 87
 We REVERSE the determination in the order of July 8, 1982 that the United States will be held jointly and severally liable with the state defendants to the private plaintiffs in their suit, for costs, including attorneys' fees and expenses.
 
 
 88
 The following holdings in the judgment of May 18, 1982 entered in the suit by the United States against the state defendants are likewise REVERSED:
 
 
 89
 (1) That the United States is not entitled to obtain equitable retroactive relief for the victims of discrimination resulting from the use of unvalidated written examinations as a selective device for hiring employees nor from the use of certificates of eligibles for racially discriminatory purposes (in paragraphs 2 and 3 of the order);
 
 
 90
 (2) The injunctive relief ordered against the United States and the federal agencies, including the requirements that they furnish the state defendants "all financial, technical, and advisory assistance necessary to establish valid minimum requirements" for certain employment positions.
 
 
 91
 All costs to be assessed against the state defendants-appellees/cross-appellants.
 
 
 92
 AFFIRMED FOR THE MOST PART; REVERSED IN MINOR ASPECTS.
 
 
 
 [1]
 For the Merit System Council, as initial codefendant, was substituted its successor agency, the Mississippi Classification Commission, by order of April 10, 1978, R.VI, p. 1391. In the state defendants' answer and cross-claim filed October 28, 1975, they (including the Merit Council) admitted that "the Merit System Council is the division of the State Department [of Public Welfare] which, by authority of the State Board [of Public Welfare], is presently responsible for the establishment of qualifications for most employment in the State Department and the various county departments and that the Merit System Council is responsible for the administration of competitive or qualifying examinations for such Employment." R.II, p. 458 at 463-64. McCarthy, Director of the Council for the years 1964-74, as a witness for the defendants, testified in 1978 to the same effect. R. XVI, pp. 1391-92
 In 1976, by legislative act, the Merit System Council became part of the Mississippi Classification Commission, when Mississippi established a consolidated merit system. See testimony of Groff, Executive Director of the Classification Commission, R. XVI, pp. 1487-88. At all pertinent times, however, the Merit System Council of the state Department of Public Welfare operated that department's merit system as a division thereof.
 
 
 [2]
 The federal defendants were the United States, the United States Department of Health and Human Services and its Secretary, the United States Department of Agriculture and its Secretary, and the United States Civil Service Commission and its Chairman
 
 
 [3]
 In 1975, after the commencement of this litigation, the state Department discontinued the use of written tests as part of the selection procedure
 
 
 [4]
 At all relevant times these prerequisites were:
 Social Worker I--College degree
 Eligibility Worker--two years (60 hours) of college credit
 Clerk-Typist--high school diploma or its equivalent
 
 
 [5]
 The ranking of names was required by federal standards. Walls, supra, 542 F.Supp. at 287
 
 
 [6]
 Included in the list of exhibits designated by the plaintiff for introduction at trial is the deposition of Rosalie Witty, County Director of Leflore County Welfare Department since March 1973. (P-393H) In her deposition, p. 7, Ms. Witty testified that she did not recall any instance where anyone she had recommended to the Commissioner did not receive the appointment
 In reading the colloquy before introduction of the plaintiffs' exhibits, it seems as if this deposition was designated for admission as evidence if the defendant did not call her as a witness. R. XIII, pp. 752-54; but cf. R. XIII, at 770-71. The witness did not testify at the trial.
 
 
 [7]
 In oral argument (although not in its brief), the state defendants urged that even if the plaintiffs' claim was not moot at the time the complaint was filed, the plaintiff was properly denied standing because a federal cause of action under Title VII had never accrued. Gambrell was excluded from the Social Worker I examination on October 16, 1971. Title VII was not made applicable to the states until March 24, 1972. Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, 86 Stat. 103. Thus the defendants argue that the plaintiffs' claim did not arise under Title VII, nor under the Fourteenth Amendment which requires proof of intent
 Although Gambrell did not re-apply for the position after the effective date of Title VII (March 24, 1972), her exclusion was nonetheless continuous until the date of her graduation (May 1972). See Guardians Association of New York City Police Department, Inc. v. Civil Service Commission of City of New York, 633 F.2d 232, 249 (2d Cir.1980), cert. denied, --- U.S. ----, 103 S.Ct. 3568, 77 L.Ed.2d 1410 (1983). (The Supreme Court had granted certiorari as to one unrelated issue in that case, solely on the basis of the plaintiff's claimed error that proof of discriminatory intent is not required to establish a Title VII violation. Guardians Association v. Civil Service Commission of City of New York, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), aff'd, --- U.S. ----, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).) To require a plaintiff to make a futile gesture such as refiling the employment application, merely to ensure standing to litigate, when in fact she was nonetheless continuously precluded from taking the examination between the dates of March 1972 and May 1972, would defeat the purpose of the standing requirement by interposing an artificial barrier to the plaintiff's otherwise meritorious claim.
 
 
 [8]
 The data in evidence indicated that 52.6% of whites and 14.9% of blacks possessed high school degrees; 10% of whites and 3.7% of blacks possessed college degrees. The district court also noted that in a five month period in 1975 when racial records were kept, 47.2% of those tested for Social Worker were black, 46.7% of those taking the Eligibility Worker exam were black, and 29.4% of the applicants for Clerk/Typist were black. The court found these percentages to compare favorably with the 29.6% of blacks in the state's total labor force
 
 
 [9]
 The employer there merely asserted that a supervisory employee benefits from formal education
 
 
 [10]
 Statutory standing for a Title VII action requires (1) the filing of a complaint with the EEOC, and (2) the receipt of the statutory notice of right to sue. 42 U.S.C. Sec. 2000e-5. Fellows v. Universal Restaurants, Inc., 701 F.2d 447, 449 (5th Cir.1983)
 
 
 [11]
 In holding that this discrepancy was not jurisdictionally fatal and that the naming of a party in the EEOC charge was instead merely a condition precedent to bringing the Title VII suit, the court noted, 678 F.2d at 1004 n. 17,
 In determining whether a condition precedent has been satisfied neither the Supreme Court nor the former Fifth Circuit have required that the conditions precedent to a Title VII action literally be met so long as the purposes of the preconditions have been satisfied. "Mindful of the remedial and humanitarian underpinnings of Title VII and of the crucial role played by the private litigant in the statutory scheme, courts construing Title VII have been extremely reluctant to allow procedural technicalities to bar claims under the Act." Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir.1970). See Love v. Pullman Co., 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972).
 
 
 [12]
 Neither Ms. Gambrell nor Ms. Walls (the only two named plaintiffs who filed EEOC charges) limited her complaint to one area of the hiring process. Both charged discrimination because of race or color. Walls complained that she was not hired despite having passed the examination, noting that she was "number five on the roster," and that several later inquiries as to vacancies met with unfavorable response. Her complaint could be construed, liberally, to criticize, as well as the certificate of eligibles process, also the ranking system which was based on performance on the written examination. Gambrell merely states that she "was not hired because of my race (Black)", without further elaborating which aspects of the hiring process purportedly were discriminatory
 
 
 [13]
 We recognize that there may be some force to the defendant's argument against the district court analysis of knowledges/skills/abilities "necessary" at entry, without its considering those qualities which may be "desirable" although not necessary. Nonetheless, in so doing the district court applied the EEOC guidelines, which require that for content validity, a knowledge/skill/ability requirement must be "a necessary prerequisite to successful job performance." 29 C.F.R. 1607. 14C(1) (emphasis added). We are unable to hold clearly erroneous the district court's methodology in its determination
 
 
 [14]
 29 C.F.R. Sec. 1607.9 (1970), in effect at the time of the litigated events, provided:
 Under certain conditions, a person may be permitted to continue the use of a test which is not at the moment fully supported by the required authority of validity. If, for example, determination of criterion-related validity in a specific setting is practicable and required but not yet obtained, the use of the test may continue: Provided: (a) The person can cite substantial evidence of validity as described in Sec. 1607.7(a) and (b); and (b) he has in progress validation procedures which are designed to produce, within a reasonable time, the additional data required. It is expected also that the person may have to alter or suspend test cutoff scores so that score ranges broad enough to permit the identification of criterion-related validity will be obtained.
 
 
 [15]
 Despite the testimony of McCarthy, the state Department's merit system director, that prior to 1973 he never had any questions raised about the examinations, R. XVI, p. 1411, the district court found that 1971 was the first date when the state Department was made aware of problems with the examination. Based on evidence in the record of meetings as early as 1971 between McCarthy and David Bell of the federal Civil Service Commission regarding the validity of the exams, together with the fact that the class action was filed in January 1973, the finding of the district court that the Department had actual notice of the racially disparate impact of the examinations long prior to May 1973 is not clearly erroneous. R. XVI, pp. 1438-41
 
 
 [16]
 McCarthy (the director) testified that he contacted Reece, a member of the staff of the Atlanta Office of the federal Civil Service Commission requesting assistance so that the state Department could comply with the federal requirements in order to obtain exam material from the federal Civil Service Commission. R. XVI, pp. 1410-11. It is not clear from the record exactly when this communication transpired. Reece, the federal official, testified that he first heard from McCarthy "about the latter part of 1973, some time around August." R. XV, p. 1273
 
 
 [17]
 The defendants contend that the district court erred in separately considering the number of blacks selected from mixed, all-white, and all-black certificates. Why this should be considered error is not altogether clear, and we cannot conjure any reason why all three types of certificates of eligibility should not have been analyzed
 
 
 [18]
 This circuit has held that the Equal Access to Justice Act applies only if no other specific statute applies. Equal Employment Opportunity Commission v. Kimbrough Investment Company, 703 F.2d 98, 103 (5th Cir.1983). We recognize that Title VII has an explicit provision that allows a prevailing party to recover from the United States reasonable attorneys' fees as part of the costs. 42 U.S.C. Sec. 2000e-5(k). However, the United States is not subject to liability under Title VII in the instant case as we have held. See Part IV supra