Clara WATSON, Plaintiff-Appellant,

v.

**FORT WORTH BANK & TRUST,**
**Defendant-Appellee.**

No. 85–1074.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1986.

Rehearing and Rehearing En Banc
Denied Sept. 30, 1986.

Art Brender, Fort Worth, Tex., for plaintiff-appellant.

Bruce W. McGee, Gandy, Michener, Swindle, Whitaker & Pratt, Fort Worth, Tex., for defendant-appellee.

Before GOLDBERG, RANDALL, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff-appellant Clara Watson appeals from the district court's judgment in favor of defendant-appellee Fort Worth Bank & Trust in Watson's Title VII and Civil Rights action alleging discrimination on the basis of race. 42 U.S.C. § 2000e *et seq;* 42 U.S.C. § 1981. For the following reasons, this Court affirms the judgment of the district court in part, but vacates the district court's judgment regarding the applicant class claims.

## I. FACTS

Fort Worth Bank & Trust ("the Bank") hired Watson in August of 1973 as a proof operator. The Bank promoted Watson to the position of teller trainee approximately two years later. After a two to three month training period, Watson became a teller in the Bank's motor bank in January of 1976. Subsequently, the Bank transferred Watson to the Bank's main lobby and later promoted Watson to the position of commercial teller on February 2, 1980.

Over the course of the next year, Watson unsuccessfully applied for four different promotions. First, in February of 1980, Watson unsuccessfully applied for promotion to the position of supervisor of tellers, which became vacant due to the resignation of assistant cashier Brian England. Watson; Richard Burt, a white male who was then the supervisor of the bookkeeping department; Gail Levitt, a white female who was then supervisor of motor bank tellers; and Pat Cullar, a white female who was then a commercial teller, all applied for the position. Gary Shipp, senior vice president and cashier at the Bank since 1977 and the person to whom the supervisor of tellers reported, selected Richard Burt as England's replacement.[1] Second,

1. The Bank hired Burt in May of 1976 as a part time motor bank teller. At the time, Burt was a full time student. Burt became a full time employee in January of 1977, working first in the general ledger department for one year, then as a credit analyst for six months, and finally as

Watson unsuccessfully applied for promotion to the position of motor bank teller supervisor. Watson, Pat Cullar, and four or five other persons applied for the position vacated by Gail Levitt. Pat Cullar received the promotion.[2] Third, Watson unsuccessfully applied a second time for the position of lobby teller supervisor when the Bank again promoted Burt. Watson, Cullar, Sylvia Hardin, a black female commercial teller, and Patsy Weatherly, a white female who was then supervisor of the proof department, all applied for the position. Burt chose Cullar. Fourth, as a result of Cullar's second promotion, the position of motor bank teller supervisor again became vacant, and Watson unsuccessfully applied for the position. Other applicants included Hardin and Kevin Brown, a white male teller in the motor bank. Based on Cullar's recommendation, Burt selected Brown for the position.[3]

Watson took a leave of absence from work in January 1981 in order to undergo foot surgery. She applied for the last two described promotions while on sick leave. Watson did not return to work after January of 1981, and she subsequently resigned in August of 1981.

## II. PROCEDURAL HISTORY

After exhausting her administrative remedies, Watson timely filed the instant suit on October 21, 1981, alleging that the Bank discriminated against her and other similarly situated persons on the basis of race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[4]

After conducting an evidentiary hearing on the class certification issue, the district court certified a class consisting of "blacks who applied to or were employed by defendant on or after October 21, 1979 or who may submit employment applications to defendant in the future." Subsequently, the district court decertified the broad class of employees and applicants because the district court concluded, in light of all the evidence at trial, that there was not "a common question of law or fact between the unsuccessful black applicants and those blacks employed by the Bank." The district court then split the class into two distinct classes consisting of (1) black applicants and (2) black employees. The district court further found that the class of black employees did not meet the numerosity requirement of Rule 23(a) and decertified the employee class.

On the merits, the district court concluded first that although Watson demonstrated a prima facie case of discrimination, she failed to demonstrate that the Bank's articulated reasons for failing to promote her were pretextual. The district court then addressed the claims of the applicant class holding that Watson's statistical evidence failed to present a prima facie case of discrimination in hiring because the per-

---

supervisor of the bookkeeping department from 1979 until his promotion to supervisor of tellers. Burt obtained a bachelor's degree in banking and finance in May of 1980.

2. Both Watson and Cullar were commercial tellers when the position of motor bank teller supervisor became vacant. Watson had six and one-half years' experience with the Bank while Cullar had worked for the Bank for only two and one-half years. Cullar, however, had almost eighteen years of experience in banking at another bank, with more than sixteen years of experience in the teller areas. Cullar and Watson scored comparably on the Bank's 104 point job performance evaluation: Watson scored 70 and Cullar scored 72.

3. The Bank hired Brown as a part time teller in October of 1979. He became a full time teller in May of 1980 and served as Cullar's assistant for six months. His previous experience included seven months as a sales person at a department store and approximately four years' experience at Six Flags Over Texas, which included some work supervising teenage seasonal employees.

4. In this Circuit, specific consideration of an alternate claim under § 1981 is necessary only if its violation is made out on grounds different from those available under Title VII. Watson does not assert such differences, and the elements of a substantive claim of employment discrimination under § 1981 parallel the elements of a Title VII claim. Page v. U.S. Industries, Inc., 726 F.2d 1038, 1041 n. 2 (5th Cir. 1984); see Rivera v. City of Wichita Falls, 665 F.2d 531, 534 n. 4 (5th Cir. 1982).

centage of blacks in the Bank's work force mirrored the percentage of blacks in Tarrant County, Texas, and the Fort Worth metropolitan area, citing *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

On appeal, Watson challenges the district court's decertification of the broad class composed of both applicants and employees and further challenges the district court's resolution of both her individual claim and the claims of the applicant class. For the following reasons, this Court affirms the judgment of the district court in part, but vacates the district court's judgment regarding the applicant class claims, remanding solely for the district court to dismiss the applicant class claims without prejudice.

## III. CLASS CERTIFICATION

A district court's class certification order is reviewed under an abuse of discretion standard. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir.1986). Even after initial certification, a district court may determine that certification was improvidently granted, and a district court remains free to decertify, subclassify or modify the class certification previously entered. Fed.R.Civ.P. 23(c)(1); *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

Prior to the Supreme Court's decision in *Falcon*, this Court permitted a plaintiff alleging race discrimination to assert an " 'across the board' attack on all unequal employment practices alleged to have been committed by the employer pursuant to a policy of racial discrimination." 457 U.S. at 152; 102 S.Ct. at 2367. *See, e.g., Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1124 (5th Cir.1969). In *Falcon*, the Supreme Court curtailed that practice holding that it was error for the district court in that case to certify a class of both applicants and employees because the district court erroneously presumed, without a specific presentation, that the requirements of Fed.R.Civ.P. 23 were met. "[W]e reiterate today that a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." 457 U.S. at 161, 102 S.Ct. at 2372.[5]

*Falcon*, however, does not foreclose all classes composed of applicants and employees. 457 U.S. at 159 n. 15; 102 S.Ct. at 2371 n. 15.[6] *See, e.g., Vuyanich v. Republic National Bank*, 723 F.2d 1195, 1199–1200, *rehearing denied*, 736 F.2d 160 (5th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984); *Richardson v. Byrd*, 709 F.2d 1016, 1019–20 (5th Cir.), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 270 (1983). The "entirely subjective decisionmaking process" articulated in Footnote 15 presents one factual situation in which a putative class might meet the requirements of Rule 23(a). Chief Justice Berger, in his concurring and dissenting opinion, suggests another: Rule 23(a)

---

**5.** Federal Rule of Civil Procedure 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Courts commonly refer to these criteria as the requirements of numerosity, commonality, typicality, and adequacy of representation.

In addition, a class action must meet one of the provisions of Rule 23(b). In this case, the district court certified the class as a Rule 23(b)(2) class finding that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]" Fed.R.Civ.P. 23(b)(2).

**6.** In footnote 15, the Supreme Court stated:

> Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes.

might be met upon a showing that "the same person or persons who made the challenged decisions were motivated by prejudice against [the protected class], and that this prejudice manifested itself in both the hiring decisions and the decisions not to promote [members of the class]." 457 U.S. at 162 & n., 102 S.Ct. at 2373 & n.

In the instant case, the district court relied on the Chief Justice's opinion to certify a class composed of both applicants and employees. After the evidentiary hearing, the district court found that a single individual, Gary Shipp, was responsible for both hiring and promotion decisions. That fact, the district court reasoned, satisfied the commonality requirement for a class composed of both applicants and employees. After the trial on the merits, however, the district court concluded that Shipp's role was more limited. The evidence at trial demonstrated that a limited group of white department supervisors made all hiring and promotion decisions, as well as employee evaluations used to compute compensation, and that upper management routinely approved those decisions. As a result, the district court concluded that Watson failed to show the existence of common questions between the applicants' and employees' claims because the same *individual* was not responsible for both hiring and promotion decisions.

Watson asserts the district court erred because the commonality requirement may be satisfied by a showing that the same *persons* make both types of decisions. Assuming, *arguendo*, that Watson is correct, this Court's inquiry does not end with that conclusion. We cannot conclude that certification of a class of both employees and applicants is mandated merely because common questions exist.[7] Rather, the other factors enunciated in Rule 23(a) also must be considered.

Thus, assuming a common question was presented in the instant case, *e.g.*, whether the same limited group of white supervisors discriminated in both hiring and promotions, that common question was not in fact a central feature in the actual proof presented at trial. The applicant class claims relied primarily on applicant flow statistics. In contrast, the proof asserted in support of the promotions claims focused on statistical evidence of the Bank's treatment of black individuals in the employee evaluation process, promotions process, compensation process and other employment practices. Consequently, the actual proof presented demonstrates that Watson's promotion claim was not typical of the applicant class claims, and she was not an adequate class representative.[8]

■■■ This Court concludes that it was not an abuse of discretion for the district court to decertify the class because, as a

7. The issue in the instant case is not whether it was correct for the district court to initially certify a broad class of both applicants and employees or whether this Court would have affirmed that certification on appeal. This Court expressly declines to address the question whether a class of applicants and employees would have been permissible under the facts of this case. Rather, the sole question presented is whether the facts of this case *mandate* a class of both applicants and employees. This Court concludes that the facts of the instant case do not mandate such class treatment.

8. As the Supreme Court noted in *Falcon*, the commonality, typicality, and adequacy of representation requirements of Rule 23(a) tend to merge. All focus on whether a class action is an economical method of adjudicating the claims and whether the plaintiff's claims and class claims are "so interrelated that the inter-

ests of the class members will be fairly and adequately protected in their absence." 457 U.S. at 157 & n. 13; 102 S.Ct. at 2370 & n. 13. In holding that typicality cannot be presumed absent a specific showing identifying common questions of law or fact, the Supreme Court focused on the evidentiary approaches necessary to sustain the individual as compared to the class claims. 457 U.S. at 159, 102 S.Ct. at 2371. *See also Lilly v. Harris-Teeter Supermarket,* 720 F.2d 326, 334 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984) (although claims of individual and class wide discriminatory termination overlapped on several important pieces of proof with claims of discrimination in promotions, the district court properly denied broad class certification because promotions claims raised significant issues of proof separate from those evidentiary issues implicated by the termination claims).

practical matter, the "maintenance of [Watson's] action as a class action did not advance 'the efficiency and economy of litigation which is a principal purpose of the procedure.'"[9] *Falcon*, 457 U.S. at 159, 102 S.Ct. at 2371 (quoting *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)). As the actual proof at trial demonstrated, the hiring and promotion claims might well have been tried separately, *id.*, and it was not an abuse of discretion to so proceed.[10]

## IV. WATSON'S INDIVIDUAL CLAIM OF DISCRIMINATION

The district court analyzed Watson's individual claim of discrimination under the test enunciated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this test, the district court

ultimately concluded that Watson was not the victim of racial discrimination.

■■■ As an initial matter, Watson asserts that the district court erred in not applying disparate impact analysis to her claims of discrimination in promotion.[11] Contrary to Watson's position on appeal, this Court's recent precedent establishes that a Title VII challenge to an allegedly discretionary promotion system is properly analyzed under the disparate treatment model rather than the disparate impact model. *See, e.g., Lewis v. NLRB,* 750 F.2d 1266, 1271 & n. 3 (5th Cir.1985); *Carroll v. Sears, Roebuck & Company,* 708 F.2d 183, 188 (5th Cir.1983); *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 620 (5th Cir.1983); *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795, 800 (5th Cir. 1982).[12] Having decided to decertify the class, the district court then properly treated Watson's claim as an individual disparate treatment claim, and the court correctly analyzed this claim under the *Green* model.

**9.** Contrary to the assertion of the dissent, this Court does not hold that the actual proof on behalf of the applicant and employee claims must be *identical* in order to maintain a class action composed of both applicant and employee claims. Rather, we hold only that a class action should advance the efficiency and economy of the litigation and the complete failure of the actual proof to overlap to any significant degree leads this Court to conclude that it was not an abuse of discretion to separately try the employee and applicant claims

**10.** Although Watson raises the point only in her reply brief, this Court concludes that the district court did not abuse its discretion in determining that the employee class failed to meet the numerosity requirement of Rule 23(a).

**11.** A plaintiff may bring a Title VII action under either the disparate treatment theory or disparate impact theory of recovery. Under the disparate treatment theory, a class must prove the existence of a pattern and practice of discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). A disparate treatment theory requires proof of discriminatory intent, which must be established by either direct or circumstantial evidence. In contrast, the disparate impact theory does not require proof of discriminatory intent. Rather, the plaintiff must show that a facially neutral employment practice has the result of producing a signifi-

cantly adverse impact on one race. *Id.; Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Walls v. Mississippi State Department of Public Welfare,* 730 F.2d 306, 315, 321–22 (5th Cir.1984); *Page,* 726 F.2d at 1045.

**12.** *See also Walls,* 730 F.2d at 321–22; *Vuyanich,* 723 F.2d at 1201–02; *Pegues v. Mississippi State Employment Service,* 699 F.2d 760, 765 (5th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 817 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982).

*But see Page,* 726 F.2d at 1046 (district court did not err in evaluating subjective promotional system under disparate impact model). Watson relies heavily on *Page* for the proposition that disparate impact analysis is appropriate in the instant case. As stated by this Court in *Carpenter,* "Were this a case of first impression in this court, we would likewise have concluded that the other [challenged practices] ... fell clearly under the disparate impact model, ... since they 'limit, segregate, or classify' employees in a manner that 'would deprive or tend to deprive any individual of employment opportunities ...' because of race...." 706 F.2d at 620. Nevertheless, this is not a case of first impression, and this Court is constrained by *Pouncy* and its progeny to apply disparate treatment analysis to Watson's claims.

Both Watson and the dissent urge that we analyze this case under a different model. Given our approval of the district court's decision to decertify the class, however, this suggestion is unavailing.

This is not to say, however, that the plethora of statistics which Watson introduced at trial, and upon which the dissent so heavily relies, are irrelevant in an individual disparate treatment case. Not only may the statistics be relevant at the initial stage of the litigation in establishing a prima facie case of discrimination,[13] but they are also relevant at the third stage of analysis when the plaintiff is attempting to prove that the reasons proffered by the defendant for its action are either unworthy of credence or mere pretexts for discrimination. See, e.g., Green, 411 U.S. at 804-05, 93 S.Ct. at 1825. In this case, the district court did not decide to decertify the class until after the trial had been completed and all the statistical evidence had been introduced. Much of the evidence, of course, was related primarily to the plaintiff's class claims. Even once the class claims dropped from the suit, however, the data retained relevance to the plaintiff's individual claim since it continued to bear on the veracity of the defendant's explanations for its promotion decisions.[14]

After hearing all the evidence, including the statistical evidence, the district court concluded that the reasons offered by the Bank were not pretextual. We judge this holding under the clearly erroneous standard. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). We conclude that the district court's finding that the Bank's explanations for its action were not pretexts for discrimination is not clearly erroneous. The district court's finding will not be set aside unless this Court on the entire evidence is left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed.2d 746 (1948). "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Watson challenges the district court's ultimate finding of no discrimination on three specific grounds: (1) that the district court erroneously relied on the Bank's subjectively administered performance evaluations, which Watson asserts were proven to be racially biased, (2) that the district court erroneously relied on a reason not articulated by the Bank for its failure to promote her, and (3) that the district court erroneously considered a series of articulated qualifications for promotion which were inconsistent, contradictory, and therefore incredible.

■ The district court specifically credited the Bank's assertion that it promoted

---

**13.** Other courts have held that an individual Title VII plaintiff may establish a prima facie case of racial discrimination by the use of statistics alone. *See, e.g., Davis v. Califano,* 613 F.2d 957, 962 (D.C.Cir.1980) ("[S]tatistical evidence may establish a *prima facie* case of employment discrimination in an individual case."); *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 762 (9th Cir.1980) (following *Davis*); *Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d 1251, 1259 & n. 7 (6th Cir.1981) (following *Davis*). *Cf. Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir.1984) ("Statistics can be relevant and important in an individual case.... But statistics alone cannot make a case of individual disparate treatment."). We need not decide this issue since Watson established a prima facie case under *Green* without relying exclusively on statistical data. Moreover, statistics are indisputably relevant in an individual Title VII case

at the third stage of the litigation: when the plaintiff attempts to establish pretext. *See, e.g., Green,* 411 U.S. at 804-05, 93 S.Ct. at 1825. Thus, in this case, the statistical data which Watson presented remained pertinent even though the class was eventually decertified. There is no indication in the record, nor is there any suggestion—either by Watson or the dissent—that the district court neglected to consider the statistical evidence presented by Watson in terms of evaluating the credibility of the Bank's proffered explanations for its promotion decisions.

**14.** We should also point out that, given our instructions *infra* in Part V, the statistical evidence might also be relevant in any class action brought in the future by the class of applicants.

Burt and Cullar rather than Watson because in all three instances Watson had less experience or supervisory experience than the individual chosen for promotion. Although the district court noted that Burt received excellent performance evaluations and that Cullar's and Watson's ratings were comparable, the district court clearly placed primary emphasis on Burt's and Cullar's experience in finding no discrimination and little emphasis on the employee evaluations. This Court cannot say that the district court's ultimate finding was clearly erroneous.

■ This Court is more troubled by the Bank's promotion of Brown because Brown clearly had less experience than Watson. The district court noted that Cullar highly recommended Brown for the promotion, relying on his performance as a teller and as her assistant. In addition, the Bank relied on Brown's experience supervising temporary employees at Six Flags Over Texas. Finally, the district court noted that Watson was on sick leave when the position became vacant and Brown, in contrast, was available immediately. The Bank, however, failed to urge this last reason as a basis for its failure to promote Watson. Disregarding this basis for upholding the district court's decision, the record nevertheless still supports "two permissible views of the evidence." Specifically, even though the reasons articulated for Brown's promotion are somewhat inconsistent with the Bank's articulated reasons for Burt's and Cullar's promotions, the district court clearly credited the Bank's explanation. We do not find any inconsistency to be so striking as to make the Bank's proffered reasons incredible. Consequently, this Court holds that the finding regarding the Brown promotion is not clearly erroneous.

## V. THE APPLICANT CLASS CLAIMS

■ After concluding that Watson was not an adequate representative of the appli-

cant class because her promotion claims were not typical of the applicant claims, the district court nevertheless chose to address the merits of the applicant claims. The district court found that Watson failed to present a prima facie case of race discrimination in hiring because the percentage of blacks in the Bank's work force mirrored the percentage of blacks in the population of Tarrant County and the Fort Worth metropolitan area.

Rather than address the correctness of the district court's reliance on population figures rather than applicant flow data, and we note parenthetically our grave concerns with the district court's approach, *see Payne,* 673 F.2d at 823–24, this Court vacates the judgment of the district court as it relates to the applicant class claims. The case is remanded to the district court to dismiss the applicant claims without prejudice. We note the unfair prejudice that might flow from a determination of the class claims when both the district court and this Court have held that the named plaintiff is not a proper class representative. *Vuyanich,* 723 F.2d at 1200; *Wheeler v. City of Columbus,* 703 F.2d 853, 855 (5th Cir.1983). *See also Goodman v. Lukens Steel Co.,* 777 F.2d 113, 125 (3d Cir. 1986).[15]

## VI. CONCLUSION

This Court finds no abuse of discretion in the district court's class decertification decision. In addition, this Court affirms the district court's conclusion that Watson was not the victim of racial discrimination. Finally, this Court vacates the district court's judgment as it relates to the applicant class claims and remands the case to the district court to dismiss those applicant class claims without prejudice. The judgment of the district court is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

**15.** As did the district court, this Court notes that equity requires that no black applicant within the relevant time period be barred from filing suit alleging individual claims or class claims as a result of reliance on the pending class action. Accordingly, the district court may enter any orders on remand it deems necessary to protect the claims of black applicant class members.

IRVING L. GOLDBERG, Circuit Judge, dissenting:

Respectfully, but without equivocation, I dissent.

The majority today continues and worsens this circuit's evisceration of the class action's role in the fight against the scourge of race discrimination. The erosion began with *Vuyanich v. Republic National Bank*,[1] and it grows today with the majority's refusal to certify a class of applicants and employees in the face of common and typical questions of fact and law and unrebutted statistical proof of a class-wide pattern and practice of discrimination. Nothing in Rule 23 or this circuit's interpretation of the rule compels this result.

The class action has been the greatest instrument in enforcing Title VII's promise that invidious race discrimination shall have no role in the workplace. Without the efficiency and economy of this procedural tool, it is safe to say that the injuries of thousands would have remained both undiscovered and unredressed.[2] And yet, in the name of the very efficiency and economy that give the class action its being, the majority disposes of only one individual's claim and forecloses forever proof of a pattern and practice of discrimination by appellee Ft. Worth Bank & Trust (the

bank). The applicants must start over from square one,[3] and the employees have no choice but to shoulder a far more onerous evidentiary burden and prosecute their claims one by one by one. This result serves neither efficiency nor economy. More significantly, it disserves Title VII by preventing the court from recognizing and eradicating what is, on the record before us, clearly a pattern and practice of discrimination. The majority has left the substantive norms of Title VII twisting in the cold wind of the Fifth Circuit's Rule 23.

The majority's opinion has at least two readily apparent consequences. First, the opinion would compel a finding that the district court's initial decision to certify the class was an abuse of discretion. This result is apparent because the nature of plaintiff's statistical proof—which the majority deems fatal to typicality—is the same whether one individual or a group of individuals makes the decisions affecting the class. Thus, even if every single decision had been made exclusively by Shipp instead of the white supervisors, this circuit would now refuse to certify the class because the class representative, in the absence of a smoking gun, was forced to rely on separate sets of statistics to prove up intent.[4]

1. 723 F.2d 1195, *rehearing denied*, 736 F.2d 160 (5th Cir.), *cert. denied* —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984).

2. As one commentator has noted
   [T]he foreclosure of broad class actions decreases a person's ability to bring a title VII suit. An individual can bring an action only if he can find an attorney willing to take his case. A plaintiff suing individually or on behalf of a small class may find it difficult to procure a competent attorney. In title VII cases, the size of an attorney's fee award usually corresponds to the number of plaintiffs involved in the suit. As the number of plaintiffs decreases, so too does the attorney's incentive to handle the case. Thus, a person may find it impossible to bring an individual suit or a narrow class action even when he has a meritorious claim.
   Note, *Certifying Classes and Subclasses in Title VII Suits*, 99 Harv.L.Rev. 619, 626 (1986). Moreover, because of differences in the scope of discovery and burdens of proof, *see* "Individual Claims" *infra*, "the difference between the success and the failure of a valid claim is often the

difference between a class action and an individual suit." *Id.* at 628,; *see also*, Chayes, *The Supreme Court, 1981 Term—Foreword: Public Law Litigation and the Burger Court*, 96 Harv.L. Rev. 4, 38–39 (1982).

3. Assuming *arguendo* that the applicants and employees must proceed separately in this case, dismissal of the applicant class is inappropriate. The proper course is a remand to the district court for the appointment of a proper class representative. *Satterwhite v. City of Greenville*, 634 F.2d 231 (5th Cir.1980) (en banc); *Carpenter v. Stephen F. Austin State University*, 706 F.2d 608, 619–20 (5th Cir.1983).

4. While the majority in footnote 7 leaves open the possibility that the district court's initial decision to certify the class would not have been an abuse of discretion, this hope is empty. Once an appellate court declares claims atypical as a matter of law, as the majority has done here, a trial court cannot waive the magic wand of judicial discretion to resurrect the claims' typicality. Moreover, even if the trial court

Second, and more important, the majority consigns pattern and practice suits to the dustbin of this circuit's history. Whether from inadvertence or fear of overflowing dockets, this circuit is erecting insurmountable obstacles to the full enforcement of Title VII. This dam threatens to stop the flow of statutory rights and holds the promise of an arid and barren future. The rights, duties, and liabilities that arise from the constitution and statutes flow freely and are not to be impeded by the fear that there will be a flood of cases. We have heard this hue and cry since the days of the constitution's nativity, and it has never stopped our judicial instrumentalities from carrying out their duties. It threatens to do so today.

To the matter directly at hand, this appeal raises two significant issues. The first is whether the district court abused its discretion in bifurcating the class. I believe that it did and would accordingly recertify the class. The second issue, which the majority does not reach, is whether the plaintiff successfully established a prima facie case of class-wide disparate treatment. I would answer this question in the affirmative as well, and hold in addition that the bank failed to rebut appellant's case. Accordingly, I would reverse and remand for appropriate relief.

*Class Certification*

Although "racial discrimination is by definition class discrimination," *General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982), Rule 23 of the Federal Rules of Civil Procedure nonetheless restricts the degree to which the courts may deploy this simple fact in structuring class actions. "[T]he allegation that such dis-

crimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." *Id.* Accordingly, "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* 102 S.Ct. at 2372.

Rule 23(a) imposes upon plaintiffs who seek to represent a class the duty to show that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These four elements are commonly refered to as the requirements of numerosity, commonality, typicality, and adequacy of representation.[5]

Prior to the Supreme Court's decision in *Falcon,* the majority rule among the circuits, and in this circuit in particular, *see Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1124 (5th Cir.1969), generally permitted "across-the-board" attacks on racially discriminatory employment practices merely upon the showing that the plaintiffs and the class they sought to represent were of the same race. *See generally* Note, *Certifying Classes and Subclasses in Title VII Suits,* 99 Harv.L.Rev. 619, 621 (1986). In *Falcon,* however, this approach ran aground on the shoals of commonality, typicality, and ade-

could do so, I think it is a sad reflection on our system of justice that the vindication of substantive civil rights can in effect hang on an essentially unreviewable exercise of the trial judge's discretion in refusing to certify a class. *Cf. supra* note 2 and *infra* note 9.

**5.** The district court must also find that the class may proceed under subsection b of Rule 23. In

this case, as in most Title VII cases, the district court certified the class under 23(b)(2), which requires a finding that

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

quacy of representation.[6] As the Supreme Court reasoned,

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company·has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

*Id.* at 2370.

In *Falcon*, a Mexican-American who had been denied a promotion sought, as in this case, to represent unsuccessful applicants as well in a broad attack on the defendant's employment practices. The district court certified the across-the-board class. The Supreme Court unanimously reversed, holding:

> Without any specific presentation identifying the questions of law or fact that were common to the claims of [the class representative] and of the members of the class he sought to represent, it was error for the District Court to presume that respondent's claim was typical of other claims against petitioner by Mexican-American employees and applicants.

*Id.* at 2371.

The Supreme Court, however, did not foreclose completely the possibility that future plaintiffs might succeed in representing an across-the-board class that did not run afoul of Rule 23's prerequisites. In particular, the Court noted:

> Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes.

*Id.* at 2371 n. 15. While footnote 15 of *Falcon* carves out an exception to what could be considered a general ban against certifying a class of both employees and applicants, it more accurately does no more than simply describe one way in which a putative class representative may satisfy Rule 23's requirement that she demonstrate claims and questions of law or fact typical and common to the class.[7] Footnote 15 does not purport to describe the whole universe of common questions of law and fact that are sufficient to unite applicants and employees in a common class. It is not a procedural straight-jacket.

Since *Falcon* at least one decision of this circuit has upheld a class of both applicants and employees.[8] In *Richardson v. Byrd,* 709 F.2d 1016 (5th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), the district court had certified a class consisting of both applicants and employees in a sex discrimination case against a Sheriff's employment practices. In holding that the district court had not erred in certifying the class, this court first noted that *Falcon* had not held "that employees never can represent applicants or that an across-the-board class is never appropri-

6. *Falcon* recognized that these three requirements tend to merge, as the first· two "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 2370 n. 13.

7. Chief Justice Burger, concurring and dissenting, wrote separately and suggested that a plaintiff may satisfy Rule 23 if she shows that "those who made the hiring decisions are the same persons who determined who was promoted." *Id.* at 2373. The Chief Justice found that the

plaintiff in *Falcon* had not met this burden, because "there is no claim that the same person or persons who made the challenged decisions were motivated by prejudice against Mexican-Americans, and that this prejudice manifested itself in both the hiring decisions and the decisions not to promote respondent." *Id.*

8. *See also Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 617 (5th Cir.1983) (statistical proof of channeling in both custodial and clerical positions set forth issues of law or fact sufficient to justify class of both custodial and clerical employees).

ate." *Id.* at 1020. The court then found a "sufficient Rule 23(a) nexus" in the defendant Sheriff's practice of restricting the assignment of all new female deputies to the jail, a practice which, because the number of positions offered females was smaller than that offered males, necessarily limited the number of females that could then be transferred to more desirable positions in the Sheriff's office. The court found "this connection between employees assigned to the jail and job applicants ... plainly sufficient to support a class of both." *Id.* at 1020. The court then found that the named plaintiff was a proper class representative because "her claim involved issues of law or fact common to those of applicants and employees assigned to the jail." *Id.*

The court based this finding on plaintiff's showing that the

> Sheriff's employment practices were infected by the "entirely subjective decision-making processes" recognized in *Falcon* as a manifestation of policy whose impact might be sufficient to connect otherwise differently situated persons. The district court found that "[t]he Sheriff's Office had no established seniority or merit system to determine eligibility for transfer o[r] promotion. Nor did it have written guidelines for promotion or transfers. Instead, promotions and transfers were determined by the supervisors, almost all of whom were male, based largely on subjective factors." This finding demonstrates that "discrimination in its broadest sense" was *not* the only claim common to Richardson and the class she sought to represent. Compare *Wheeler v. City of Columbus,* 703 F.2d 853 (5th Cir.1983). The concerns of *Falcon* were met when the proof surfaced an accused employment *practice* that adversely affected her and the certified class of employees and applicants. *See Carpenter v. Stephen F. Austin State University,* 706 F.2d 608 (5th Cir.1983) (custodial workers held to be proper class representatives of clerical workers since both were affected by subjective job assignment procedure).

The district court did not err in certifying this class.

*Id.*

Faced with Watson's claim to represent a class of applicants and employees at Ft. Worth Bank & Trust, and mindful of the Supreme Court's recent decision in *Falcon,* the district court properly held a full day's evidentiary hearing on plaintiff's request.

The court made the following findings as to the common decision-making process affecting applicants and employees:

> Hiring decisions at the Bank are made by the department supervisors, who then submit their decisions to Gary Shipp for formal approval. Shipp rarely vetoes hiring decisions made by those supervisors reporting to him. Shipp personally interviews some applicants but makes the final hiring decisions only for those persons working directly under his supervision. During all periods relevant to this suit, Shipp had final authority over all personnel matters.

> Performance evaluations and promotion decisions are made by the supervisors for those employees under their authority. Since 1978 employees have been given yearly written evaluations which are completed by their supervisors. Salary increases are calculated on the basis of the performance ratings. The supervisors present the evaluations to the Salary Review Committee, which consists of the president or executive vice president of the Bank, the officer in charge of personnel and the senior operations officer. Occasionally a change in the Supervisor's rating is made, with the concurrence of the full committee. Gary Shipp has been a member of the Salary Review Committee during the entire period relevant to this case. However, he has no more influence over the employee ratings than do the two other committee members.

Memorandum Opinion, Rec. at 398. Thus, the same exclusively white supervisory staff that makes the hiring decisions also makes essentially all decisions affecting

employees within their respective departments. The Salary Review Committee represents the only aberration in this process, in that it rather than Shipp has the final say in salary decisions. However, raises hinge on the score an employee receives from her supervisor's evaluation, and these evaluations are rarely disturbed by the reviewers. In effect then, the supervisors for the most part determine an employee's raise as well as her initial rate of compensation.

In its opinion certifying the class, the district court concluded that Watson had presented "exactly that type of evidence" envisioned by *Falcon*'s footnote 15. Rec. at 220. This evidence consisted of appellant's showing that Gary Shipp was "responsible for both the hiring and promotion at defendant bank, and has been for over five years.... Although defendant asserts that Mr. Shipp does not make the hiring decisions, it is obvious he does have 'input' into those decisions, with the potential to 'sway' or otherwise influence their outcome through his discussions with the supervisors. The evidence before the Court shows that Mr. Shipp reports directly to the bank officers and has never advanced a black to a position of supervisor." Rec. at 221. The district court therefore certified a class consisting of all blacks who have been employed by or applied for employment with the Bank since October 21, 1979, or who may apply to the bank in the future. The court found that the class of applicants numbered over one hundred and the class of past and current black employees numbered fifteen as of June 1982.

A district court remains free under Rule 23(c)(1) to reassess and alter its certification order at any time prior to a decision on the merits "if, upon fuller development of the facts, the original determination appears unsound." Advisory Committee Comment; *see also Richardson v. Byrd, supra,* 709 F.2d at 1019. The district court exercised this freedom in splitting the class and offered the following reasons:

> Upon hearing trial testimony on the scope of Gary Shipp's participation in hiring and promotion decisions, the Court has determined that there is not a common question of law or fact between the unsuccessful black applicants and those blacks employed by the Bank. The evidence showed that although Shipp has final authority over all personnel decisions, his function is largely one of reviewing decisions made by those department supervisors reporting to him. The evidence showed that supervisors make hiring and promotion decisions for their departments, subject to Shipp's approval, and that as a general rule he defers to their judgment. Supervisors also make the initial employee evaluation upon which raises are calculated, subject to approval by the three member Salary Review Committee. Shipp is a member of the committee but does not have a disproportionate impact on the committee's decisions.
>
> Accordingly, after hearing more evidence on the scope of Shipp's participation in the wide range of personnel decisions made by the Bank, the Court finds that Shipp did not make all hiring decisions and all subsequent decisions as to the employees' terms and conditions of employment. Therefore, within the discretion under Rule 23 to alter the class certification, the Court finds that two distinct classes exist: (1) those blacks who have applied to the Bank for employment since October 21, 1979, but were not hired and those blacks applying in the future; and (2) those blacks who have been employed by the Bank since October 21, 1979.

Rec. at 404.

We review the district court's certification or decertification of a class only for an abuse of discretion, *Richardson v. Byrd:*

> We recognize that these complex cases cannot be run from the tower of the appellate court given its distinct institutional role and that it has before it printed words rather than people. It follows that class certification decisions must be protected by a level of review that accords substantial discretion.

709 F.2d at 1019.[9] I also heed the bank's warning that it is one thing, given the numerous mandatory prerequisites that must be satisfied under Rule 23, to find that a district court abused its discretion in certifying a class, and quite another, given the permissive language of Rule 23(b) ("An action *may* be maintained as a class action ...") (emphasis added), to hold that a district court abused its discretion in failing to certify a class or, as in this case, in decertifying a class.[10]

To show an abuse of discretion, "plaintiffs on appeal must demonstrate facts in the record below that indicate, among other things, the typicality of their claims and their adequacy as representatives of the excluded members of the putative class." *Crawford v. Western Electric Co., Inc., supra*, 614 F.2d at 1305. When plaintiffs have demonstrated these facts or other common questions and issues, appellate courts have rarely hesitated in ordering the certification or recertification of the class. *See, e.g., Samuel v. University of Pittsburgh*, 538 F.2d 991, 997 (3d Cir.1976) (recertification); *Marcera v. Chinlund*, 595 F.2d 1231, 1237–40 (2d Cir.) (defendant class and expanded plaintiff class certified), *vacated on other grounds sub nom. Lombard v. Marcera*, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979); *Paxton v. Union National Bank*, 688 F.2d 552, 561 (8th Cir.1982) (certification), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Appleyard v. Wallace*, 754 F.2d 955, 957–59 (11th Cir.1985); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 448–57 (3d Cir.1977) (antitrust case), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

In this case the district court plainly erred in concluding that there was no question of law or fact common to both the black applicants and employees.[11] It is abundantly clear from both the record and the district court's opinion that the claims of both applicants and employees were united by common questions of fact. First, the same persons generally made the hiring, evaluation, and promotion decisions for their respective departments. As the district court acknowledged, the "evidence showed that supervisors make hiring *and* promotion decisions for their departments, subject to Shipp's approval, and that as a

---

**9.** While class certification decisions are protected by a level of review that accords substantial discretion, it would seem that this level of review should not be applied uniformly to all the elements that guide the district judge's decision. For example, the determinations whether there are questions of law or fact common to the class and whether the claims or defenses of the representative parties are typical should be and are relatively straightforward. On these questions, a level of review that accords substantial discretion is inappropriate, as the appellate court is equally if not more competent than the trial court to make those determinations.

On the other hand, the trial court is generally in a better position to determine whether the class is so numerous that joinder of all members is impracticable. The trial court is also generally in a better position to determine whether the representative parties will fairly and adequately protect the interests of the class, insofar as the determination involves an assessment of the competency of counsel and the zeal of the plaintiff.

**10.** *But see Crawford v. Western Electric Co., Inc.,* 614 F.2d 1300, 1304 (5th Cir.1980) ("Since plaintiffs point to no evidence in the pretrial hearing that would *mandate* a finding by the district

judge that plaintiffs were adequate representatives of a class that included other types of employees and nonemployees, we perceive no basis on which to find error or an abuse of discretion.") (emphasis added).

**11.** The trial judge based this conclusion on his finding that "Shipp did not make all hiring decisions and all subsequent decisions as to the employees' terms and conditions of employment." This conclusion in turn undermined his initial decision that "whether Shipp is prejudiced against blacks and whether this prejudice is reflected uniformly in the Bank's employment practices provided the common question to satisfy the typicality and commonality requirements." Rec. at 403. This initial decision, although correct in itself, had in turn been premised upon a misreading of Chief Justice Burger's opinion in *Falcon*. The trial judge read the Chief Justice's opinion to mean that a common question was present only when the same person made both hiring and promotion decisions. The Chief Justice, however, did not limit himself to a single person, but recognized that common questions presented themselves when the "same person *or persons*" made decisions affecting both applicants and employees. *Falcon*, 102 S.Ct. at 2373 (emphasis added).

general rule he defers to their judgment." Rec. at 404 (emphasis added). These managerial arrangements are disturbed only when the three member Salary Review Committee intrudes to approve raises. However, the supervisors who make the hiring and promotion decisions also make the initial employee evaluations on which the raises are strictly based, and these evaluations are seldom disturbed. Thus, the fact that Shipp himself does not loom as prominently in the formulation and execution of personnel policy as once thought does little to undermine the pressing presence of a common question of fact concerning the role of the all-white supervisory personnel.

The majority, however, would deny certification because "the actual proof presented demonstrates that Watson's promotion claim was not typical of the applicant class claims." This conclusion rests upon the following assertion:

> Thus, assuming a common question was presented in the instant case, *e.g.*, whether the same limited group of white supervisors discriminated in both hiring and promotions, that common question was not a central feature in the actual proof presented at trial. The applicant class claims relied primarily on applicant flow statistics. *In contrast,* the proof asserted in support of the promotions claims focused on statistical evidence of the Bank's treatment of black individuals in the employee evaluation process, promotions process, compensation process and other employment practices. [emphasis added]

This assertion embodies a profound misunderstanding of what the statistical proof represents.

The majority's assertion is equivalent to nothing more than the following: "The applicant class claims relied on statistics relevant to the applicants, and the employee class claims relied on statistics relevant to the employees." I fail to see how this can be fatal to typicality.[12] First, there is no relevant "contrast". Both sets of statistics represent the decisions of the same group of white supervisors. The fact that these white supervisors were not raked over the coals or did not have their motives examined explicitly is irrelevant. Statistical proof allows a plaintiff to infer and prove intent in the expected absence of candid admissions of intent to discriminate. That is what statistical proof is all about. Thus, the decisions of these white supervisors were indeed a central feature in the actual proof presented at trial.

Second, proof of disparate treatment against a class of employees and applicants would be impossible without both sets of statistics. If an employer discriminates against black applicants, a plausible inference is that he does not suddenly become a Frederick Douglass to his employees. Each set of statistics bolsters the other and makes possible a finding of a pattern and practice of discrimination. There simply does not exist one all-encompassing statistical measure by which plaintiffs can describe the decisions affecting both applicants and employees. The majority's requirement that the proof be identical for both groups is logically impossible and amounts to a requirement that the named plaintiff suffer injuries identical to those of the class members. However,

> Had the Supreme Court in *Falcon* meant to require identical injuries, it would not

---

12. While the district court's bifurcated findings on the individual and class claims could be cause for some concern, *Falcon*, 102 S.Ct. at 2371, the fact that individual and class findings can be stated separately cannot possibly serve as a blanket excuse for the denial of class certification. If this were so, Watson would have been an improper representative had she simply sought to represent a class of employees denied promotions.

This concern in *Falcon* arose from the class representative's attempt to prosecute a claim of disparate *treatment* on behalf of himself and a claim of disparate *impact* on behalf of the class. These two claims involve substantially different and unrelated elements of proof. Here, however, Watson advances both her individual and class claims under a theory of disparate treatment. Both of these claims require proof of discriminatory intent, and a finding of intent on either claim will benefit the other. This nexus, together with the presence of a substantial common question of fact, is more than adequate to satisfy the requirement of typicality.

have offered examples of ways to establish relationships between employment positions. Nor would there remain a need for an analysis of typicality; the representative plaintiff would either be or not be a member of the class. This approach both undermines the congressional intent underlying Title VII and misconstrues the holding of *Falcon*.

4 N. Newberg, Newberg on Class Actions § 24.13 (2d ed. 1985). The district court erred in decertifying the class, and the majority has chosen to enshrine that error as the law of this circuit.

*Falcon*'s footnote 15 provides an additional basis for certifying the class of applicants and employees. First, as will be clear from the impending discussion of the bank's liability,[13] plaintiff presented "significant proof" that the bank operated under a "general policy of discrimination."[14] Second, "the discrimination manifested itself in the same general fashion"—first, as already discussed, through the common bond of the supervisors and Shipp; and second, through "an entirely subjective decisionmaking process." As in *Richardson*

v. *Byrd*, there was no established seniority or merit system and no written guidelines to assist in either hiring or promotion decisions. "Instead, promotions and [hires] were determined by the supervisors, ... all of whom were [white], based largely on subjective factors." *Id.* at 1020.

As to Watson's ability to represent the class adequately, I find it particularly significant that the district court found, with complete support from the record, that "plaintiff proceeded zealously on behalf of the group of blacks who applied for employment by the Bank, as well as those blacks employed by the Bank." Rec. at 407. Moreover, even though the district court split the employees from the applicants, it passed up the option of appointing a new representative[15] and proceeded to reach the merits of the applicant class' claim on the basis of Watson's zealous representation. Thus, on the record before me, I would hold that the district court abused its discretion in finding a lack of questions of law or fact common to the class, and I would direct the court to recertify the plaintiff class. *Accord Samuel v.*

---

**13.** The Supreme Court noted in *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 that

> Where no class has been certified, however, and the class claims remain to be tried, the decision whether the named plaintiffs should represent a class is appropriately made on the full record, including the facts developed at the trial of the plaintiffs' individual claims.

*A fortiori*, when a class has been certified and the class claims already tried, the certification decision may properly take into account all the evidence presented. As one commentator has noted.

> Courts are permitted to look to the merits of a controversy in order to determine if liability theories or their proof are common to the class. Statistics are frequently presented by class plaintiffs to prove a prima facie case of discrimination, giving rise after the fact to questions common to the class.

4 N. Newberg, Newberg on Class Actions § 24.-22 (2d ed. 1985).

**14.** In *Vuyanich v. Republic National Bank of Dallas*, 723 F.2d 1195 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984), the court decertified a class of applicants and employees and distinguished *Richardson v.*

*Byrd, supra,* and *Carpenter v. Stephen F. Austin University, supra,* by concluding that plaintiffs in *Vuyanich* had not carried their burden of proving a "general policy of discrimination": "The district court's finding that the Bank relied on two objective inputs—education and experience—in its necessarily subjective hiring process ... precludes reliance on this 'general policy of discrimination' exception." *Vuyanich* at 1199–1200. In the case at bar, the employees' education and experience were considered in promotion decisions. For the reasons expressed in the dissent from the denial of rehearing en banc in *Vuyanich*, 736 F.2d 160, 162, I would have serious misgivings were I compelled to follow this aspect of *Vuyanich*. The presence of objective factors in a necessarily subjective hiring process does not render that process any less subjective or any less discriminatory.

I rely therefore on *Richardson v. Byrd*, in which the finding of a general policy of discrimination was premised in part on decision-making "based *largely* on subjective factors." 709 F.2d at 1020 (emphasis added). *Byrd* was prior in time to *Vuyanich*, and if this circuit wishes to hoist *Vuyanich* to the highest point on the flagpole of Fifth Circuit jurisprudence, it can do so only through an *en banc* opinion of this circuit.

**15.** *See supra* note 3.

*University of Pittsburgh, supra*, 538 F.2d at 997.[16]

## Class Claims

The not particularly voluminous record in this case does not disclose any substantial anecdotal evidence of racial animus. In fact, Ft. Worth Bank & Trust, a not particularly large bank with approximately eighty employees in Ft. Worth, Texas, called at trial several of its black employees, who testified that they had never detected any racial discrimination during the course of their employment with the bank.

The numbers, however, belie the bank's claim that it has not discriminated against the class on the basis of race. When Watson began her career at the bank as a proof operator in August 1973, the bank employed four other blacks on its fifty member work force. Two printed checks in the basement, one was a kitchen attendant, and the last was a porter. The bank has never had a black director or officer, nor has it ever had a black supervisor. Watson's unrebutted statistics indicate that a black who applies for a job at the bank has one-fourth the chance of a white applicant to get the job; should the black be hired, her performance is apt to be evaluated thirty points lower and she is apt to be paid $46.00 per month less than an identically qualified white; and the Bank is likely to advance her to greater responsibilities at a rate six-tenths of a pay grade per year more slowly than the equally qualified white. Watson herself unsuccessfully sought promotion on four occasions to supervisory positions.

A plaintiff may attempt to bring a cause of action under Title VII, 42 U.S.C. § 2000e *et. seq.*, on either the disparate treatment or the disparate impact theory of recovery. At the outset, one is faced with appellant's contention that the district court erred in failing to assess her proof under the disparate impact model. Because plaintiff has succeeded in proving class-wide racial discrimination under the disparate treatment theory, I find it unnecessary to decide whether she could have proceeded under a disparate impact model as well.[17]

---

**16.** Although I have no basis for concluding that the interests of the named plaintiff and other class members would conflict during the relief stage, should they do so, the district court may employ subclasses pursuant to Fed.R.Civ.P. 23(c)(4)(B). "When the class members are united in interest on the liability issues but have potential conflicts regarding the nature of the relief or the division of a monetary award, the court may avoid the potential conflict by creating subclasses." 1 N. Newberg, Newberg on Class Actions § 3.31 (2d ed. 1985).

**17.** In taking this course, I avoid what appears to be a developing intra- and inter-circuit conflict on the reach of disparate impact analysis. In *Pouncy v. Prudential Insurance Co.*, 668 F.2d 795 (5th Cir.1982), this court held that "the disparate impact theory applied to an 'overt, clearly identified *nondiscretionary* selection criteri[on] that [was] applied at a single point in a selection process.'" *Id.* at 800 (citations omitted) (emphasis added). Accordingly, the practice of evaluating employees by means of subjective criteria was held not to be "akin to the 'facially neutral employment practices' the disparate impact model was designed to test." *Id.* at 801. *Accord Payne v. Travenol*, 673 F.2d 798, 817 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982); *Pegues v. Mississippi State Employment Service*, 699 F.2d 760 (5th Cir.1982), *cert. denied*, 464 U.S. 991, 104 S.Ct.

482, 78 L.Ed.2d 679 (1983); *Vuyanich v. Republic National Bank of Dallas*, 723 F.2d at 1202.

On the other hand, in language that is difficult to reconcile with *Pouncy*, the court in *Page v. U.S. Industries, Inc.*, 726 F.2d 1038 (5th Cir. 1984), held that the disparate impact model could be properly applied to assess "a promotional system which is based upon subjective selection criteria," because "such a system can be facially neutral but yet be discriminatorily applied so that it impacts adversely on one group." *Id.* at 1046. In *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir.1985), Judge Tuttle wrote that former Fifth Circuit precedent—with which *Pouncy* was found implicitly to be in conflict— "allow[s] disparate impact challenges to the end result of multi-component selection procedures and to subjective selection procedures." *Id.* at 1523. The *Griffin* court also found that the use of disparate impact theory in those circumstances is appropriate in and of itself. *Accord Hawkins v. Bounds*, 752 F.2d 500, 503 (10th Cir. 1985).

This dispute is not insignificant, as it directly affects a plaintiff's burden of proof. In contrast to the plaintiff's burden under the disparate treatment model, plaintiff need not prove discriminatory motive under a disparate impact model, nor does a showing of disparate impact carry with it any implication of discriminatory intent. Thus, while both models assess the "im-

The burden of proof in a class-wide disparate treatment case is well established:

[T]he Title VII plaintiff must prove the existence of a pattern and practice of race discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To succeed in a disparate treatment case, a plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* at 336 & n. 16, 97 S.Ct. at 1855 & n. 16. He or she must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Ibid.* In a disparate treatment case discriminatory intent must be established by either direct or circumstantial evidence. *Teamsters, supra*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Wheeler v. City of Columbus, Miss.*, 686 F.2d 1144, 1150 (5th Cir. 1982)....

Under the disparate treatment analysis, a Title VII plaintiff may establish a prima facie case of disparate treatment using statistics alone if the statistics show a "gross disparity" in the treatment of workers based on discriminatory factors such as race. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Carroll v. Sears Roebuck & Co., supra*, 708 F.2d at 190; *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 817 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). [*See also Pouncy v. Prudential Insurance Co. of America, supra*, 668 F.2d at 802 ("When 'the statistical showing is sufficiently strong in a disparate treatment action, [the] plaintiffs' prima facie case can be made without additional evidence establishing that [the] defendant purposefully treated minorities protected under Title VII less favorably than other persons.'") (citation omitted).]

However, if the statistical disparity shown by the plaintiffs' evidence is insufficient alone to establish a prima facie case of disparate treatment, we have held that a Title VII plaintiff "may get over his or her hurdle by combining statistics with historical, individual, or circumstantial evidence." *Payne, supra*, 673 F.2d at 817; *Carroll, supra*, 708 F.2d at 190. In order to rebut a prima facie case of disparate treatment, the defendant must discredit the plaintiff's evidence or provide a non-discriminatory explanation for the apparently discriminatory result. *Ibid.*

*Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1045–46 (5th Cir.1984). "General assertions of good faith or of hiring only the best applicants, however, are insufficient to meet this burden. If the employer fails to rebut the plaintiff's case, the district court may conclude that Title VII has been violated." *Payne v. Travenol Laboratories, Inc., supra*, 673 F.2d at 817.

The Supreme Court has held that a statistical difference between the treatment accorded a class and that accorded other persons reaches the requisite "gross disparity" when the difference between the expected treatment and the actual treatment is greater than two or three standard deviations. *Castaneda v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977). "The 'standard deviation' is a way to calculate the likelihood that chance is responsible for the difference between a predicted result and an actual result.... Statisticians tend to discard chance as an explanation for a result when deviations from the expected value approach two standard deviations." *Payne v. Travenol*, 673 F.2d at 821 n. 32 (providing formula).

pact" of a defendant's employment practices upon the plaintiff class, this difference in the burden of proof creates a situation in which the threshold at which the impact triggers prima facie liability is significantly less under the disparate impact theory. *Page v. U.S. Industries*, 726 F.2d at 1054 (disparate treatment requires showing of "gross disparity," while a "marked disproportion" suffices to prove disparate impact).

Thus, when the standard deviation exceeds two and an explanation from the defendant that something other than race explains the disparity is not forthcoming, the defendant will be held liable.

Plaintiffs may also express statistical disparities in terms other than standard deviations. For example, in this case, plaintiff has used a chi-square test to express her findings in terms of the statistical significance of a disparity. A finding that a disparity is statistically significant "at the 0.05 or 0.01 level" means that there is a five percent or one percent probability, respectively, that the disparity is due to chance. For large samples, the test of two or three standard deviations found by the Supreme Court to constitute sufficient proof "is essentially equivalent to a rule requiring significance at a level in the range below 0.05 or 0.01." *Craik v. Minnesota State University Board*, 731 F.2d 465, 476 n. 13 (8th Cir.1984) (quoting Baldus & Cole, *Statistical Proof of Discrimination* § 9.03, at 297 (1980)); *accord Rivera v. City of Wichita Falls*, 665 F.2d 531, 545 n. 22 (5th Cir.1982); *see also Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 318 n. 5, 97 S.Ct. 2736, 2747 n. 5, 53 L.Ed.2d 768 (Stevens, J., dissenting).

With these minimal statistical guides in hand, I turn now to plaintiff's statistical evidence. Before I do, however, one cautionary note, sounded before, is in order:

The bar is reminded that sound statistical analysis is a task both complex and arduous. Indeed, obtaining sound results by these means, results that can withstand informed testing and sifting both as to method and result, is a mission ... comparable [in] difficulty to arriving at a correct diagnosis of disease.

We are no more statisticians than we are physicians, and counsel who expect of us informed and consistent treatment of such proofs are well advised to proceed as do those who advance knotty medical problems for resolution. Our innate capacity in such matters extends to "the inexorable zero" and perhaps, unevenly, somewhat beyond; but the day is long past—past at least since the Supreme Court's sophisticated analysis in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)—when we proceed with any confidence toward broad conclusions from crude and incomplete statistics. That everyone who has eaten bread has died may tell us something about bread, but not very much.

*Wilkins v. University of Houston*, 654 F.2d 388, 410 (5th Cir.1981) (citation omitted), *cert. denied*, 459 U.S. 822, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982).[18] Accordingly, courts rely heavily on the adversary process to illuminate both the strengths and weaknesses of proffered statistical proof. Where a party chooses to leave facially significant proof essentially unrebutted, that party proceeds at her own peril, for a court will not presume to shoulder her burden of rebuttal.[19]

Working from a stipulated data base, appellant first presented evidence regarding discrimination in hiring. Of 533 white and 144 black applicants during a period of

---

**18.** For an example of the perils of mixing uninformed judicial intuition with statistical analysis, see *Pennsylvania v. Rizzo*, 466 F.Supp. 1219, 1229 (E.D.Pa.1979), in which the district court found that a small sample size defeated plaintiffs' showing of statistical significance. As pointed out in Baldus & Cole, *supra* § 9.1 (1985 Supp.), however, plaintiff's proof of statistical significance had already taken into account the sample size. "The court, in effect, double counted the influence of the small sample." *Id.* (other cases cited).

**19.** Except in the area of salary, *see infra* note 30, defendant presented the skimpiest of rebuttal evidence. As witnesses, the bank called four white officers and three black employees, none of whom had any special statistical expertise and who could only testify to, in the case of the whites, the bank's good faith, and, in the case of the blacks, the absence of any noticeable discriminatory climate. None of the black witnesses, however, had any knowledge of the statistical disparities. At best, these witnesses rebut any anecdotal evidence. Where the plaintiff is relying on statistical evidence, however, these witnesses are about as useful as a football in a game of basketball. Moreover, as will be explained in the text, the attempts by defendant's counsel to undermine the statistics on cross-examination are unavailing.

over four years, 16.7% of the whites and 4.2% of the blacks received offers of employment.[20] Plaintiff's expert testified that the disparity was significant at 0.0001, meaning that the probability that this result was due to chance was one in ten thousand. Rec. at 119. My own calculations show that the difference between the actual number of black offers and the expected value is greater than three standard deviations. This pattern repeated itself to a somewhat lesser extent in appellant's analysis of offers to those applicants who specifically requested a teller position[21] (significant at 0.01) or a clerical position[22] (significant at 0.05). In addition, appellant tested to see whether certain cycles in the bank's hiring period, during which the bank's hiring needs fluctuated, could account for the observed disparity. Appellant looked for the possibility that blacks tended to apply in greater numbers when the bank's hiring needs were less. However, the data indicate that blacks and whites did not apply at significantly different times vis-a-vis the bank's hiring cycle.[23]

The district court, for reasons unarticulated in its opinion, completely ignored these data. Instead, it held as follows:

After considering the statistical evidence introduced by plaintiffs regarding the hiring of blacks by defendant, the Court finds that they do not present a prima facie case of race discrimination. Blacks represent 13.1% of defendant's non-exempt employees and 11.8% of the population of Tarrant County, 10.2% of the population of the Fort Worth Metropolitan area and 22.8% of the population of Fort Worth. Accordingly, the Court finds that no discrimination against blacks as a class has been proved on the basis of defendant's hiring practices.

Rec. at 407.

As a finding of fact, the district court's ultimate finding on the existence of discrimination may not be overturned unless clearly erroneous. *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 1788, 72 L.Ed.2d 66 (1982). A finding of fact is clearly erroneous if the reviewing court is left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

I believe it unnecessary to decide whether the conclusion drawn by the district court from the population data is clearly erroneous, because I would agree with appellant that the district court erred as a matter of law in working from the population figures rather than the applicant flow data. Defendant argues correctly that population figures are preferable when the

20. The data are described in the following chart:

OFFERS OF EMPLOYMENT, BY RACE

|  | WHITES | BLACKS |
|---|---|---|
| OFFER | 16.7% (89) | 4.2% (6) |
| NO OFFER | 83.3%(444) | 95.8%(138) |
| TOTAL | 100.0%(533) | 100.0%(144) |

Plaintiff's Exhibit (hereafter "P-x") 10.

21.

OFFERS TO TELLER APPLICANTS, BY RACE

|  | WHITES | BLACKS |
|---|---|---|
| OFFER | 20.1% (32) | 5.3% (6) |
| NO OFFER | 79.9%(127) | 94.7%(54) |
| TOTAL | 100.0%(159) | 100.0%(57) |

P-x 13.

22.

OFFERS TO CLERICAL APPLICANTS, BY RACE

|  | WHITES | BLACKS |
|---|---|---|
| OFFER | 15.2% (30) | 4.8% (3) |
| NO OFFER | 84.8%(168) | 95.2%(60) |
| TOTAL | 100.0%(198) | 100.0%(63) |

P-x 17.

23. The data are summarized in the following table and cover nine six-month periods:

applicant flow data is shown to be significantly flawed. *Payne v. Travenol,* 673 F.2d at 823. However, absent significant flaws in the applicant flow data, these data are far more relevant than general population data to an analysis of an employer's hiring practices. *Id.* at 834–24; *see also Hazelwood,* 97 S.Ct. at 2742 n. 13 (applicant flow data "very relevant").

The bank's only attack on the applicant flow data is a claim that the data fail to take into account either the applicants' qualifications or the possibility that duplicative applications skew the data base. Assuming *arguendo* that the bank's non-exempt positions do require minimal qualifications—a point on which the defendant offered no evidence[24]—the bank nonetheless suggested no reason to assume that these qualifications were unevenly distributed between blacks and whites. Absent proof to the contrary, courts should decline to assume that blacks and whites do not possess the relevant qualifications in equal proportions. *Payne v. Travenol,* 673 F.2d

APPLICANTS, BY RACE, IN DIFFERENT
HIRING PERIODS

|  | WHITES | BLACKS |
|---|---|---|
| *PERIODS DURING WHICH LESS THAN 10% OF APPLICANTS HIRED* | 48.6%(259) | 52.8% (76) |
| *PERIODS IN WHICH MORE THAN 10% OF APPLICANTS HIRED* | 51.4%(274) | 47.2% (68) |
| TOTAL | 100.0%(533) | 100.0% (144) |

The chi-square probability is 0.37.
P-x 22.

**24.** At one point in his testimony, Shipp asserted that, based on his recollection of the applicant flow, "basically whites do generally have more previous experience" than blacks. Rec. Vol. V. at 43. However, he had not preserved the data on which this recollection was based and I would therefore find it unworthy of credence; it amounts to little more than an unacceptable "[g]eneral assertion[ ] of good faith or of hiring only the best applicants." *Payne v. Travenol, supra* 673 F.2d at 817.

**25.** The bank also submitted its own analysis of the applicant flow data which was restricted to applications received within fourteen days of thirty-five hires. This analysis showed that since October 21, 1979, 63 blacks and 108 non-

at 822; *De Medina v. Reinhardt,* 686 F.2d 997, 1008 (D.C.Cir.1982). The same argument applies with equal force to the bank's contention regarding duplicate submissions.[25]

In the clear and unshaded light of appellant's statistical evidence, I would conclude that the district court's conclusion that appellant failed to make out a prima facie case of discrimination in hiring is clearly erroneous. Because the bank wholly failed to rebut appellant's proof, I conclude that the bank has discriminated against the class on the basis of race in its hiring.

I would conclude as well that the bank has discriminated on the basis of race against the employee members of the class. By far the most compelling evidence on this point—and one that also went unrebutted—concerns the disparate treatment accorded the class in the evaluation process.[26] Over a period covering four annual evaluations, blacks rated an average of eleven to

blacks had applied for the 35 positions, and that 8% of the blacks and 28% of the non-blacks were hired. As appellant's expert showed, however, these data still cut in appellant's favor, as the disparity was statistically significant at 0.01. Defendant's Exhibit 2; Rec. Vol. V at 132–33.

**26.** Each supervisor rates the employees under his or her supervision in twelve categories on a scale from zero to seven, eight, nine, or ten. The categories are: (1) Accuracy of work; (2) Alertness; (3) Personal Appearance; (4) Supervisor-co-worker relations; (5) Quantity of Work; (6) Physical Fitness; (7) Attendance; (8) Dependability; (9) Stability ("The ability to withstand pressure and remain calm in most situations"); (10) Drive ("Ambition"); (11) Friendliness and Courtesy; and (12) Job Knowledge. Plaintiff's Exhibit 4.

Few of these categories have much objective content. For example, "personal appearance," "drive," and "friendliness and courtesy" are clearly subjective on their face. While "Quantity of Work" could lend itself to objective measurement, the rating system itself is also subjective: 0–1, "does not meet minimum requirement"; 2–3, "does just enough to get by"; 4, "volume of work is satisfactory"; 5–6, "very industrious does more than is required"; 7–8, "superior work production record." This type of subjective measurement lends itself to discriminatory bias, be it conscious or unconscious.

fifteen points lower than their non-black co-workers. These differences are statistically significant from 0.05 to 0.001.[27] In order to see whether factors other than race accounted for these disparities, appellant presented a multiple regression analysis of the data, controlling for the employees' prior experience and initial grade placement at the time of hire. This analysis showed a coefficient for race of –34.37 on the first evaluation and –39.31 on the second evaluation, which means that, after controlling for the effects of experience and grade at hire, blacks scored 34.37 and 39.91 points below non-blacks on the first and second evaluations, respectively, during the period of the class. Both coefficients are significant at 0.001.[28]

Appellant also analyzed the bank's promotions and compensation practices as they affected non-exempt employees. Blacks averaged consistently less across the board.[29] Because the presentation of raw averages alone is generally not considered probative of disparate treatment, *see Pouncy v. Prudential Insurance Co. of America, supra,* 668 F.2d at 802–03, appellant conducted another multiple regression analysis to control for various factors—listed in note 29 below—that might have affected the averages. This analysis again reflected significant disparate treatment of blacks, revealing a disparity in salary of $45.98 per month.[30] This latter figure was statistically significant at .05, which appellant's expert characterized as "compelling" and "actually kind of remarkable, given how much went into that equation and the quantity of the number of black employees." Rec.Vol. V at 174.[31]

27. The data are set out in the following table:

MEAN EVALUATIONS, BY RACE, DURING PERIOD OF CLASS

| | NON-BLACKS | BLACKS |
|---|---|---|
| *FIRST EVALUATION* | 78.0 | ***63.0 |
| *SECOND EVALUATION* | 82.8 | **69.2 |
| *THIRD EVALUATION* | 84.6 | **73.9 |
| *FOURTH EVALUATION* | 85.9 | *74.7 |

\* —Statistically significant at .05
\*\* —Statistically significant at .01
\*\*\*—Statistically significant at .001

P-x 26.

28. In tabular form, the results are as follows:

STATISTICAL REGRESSIONS FOR EMPLOYEE EVALUATIONS, BY RACE

| DEPENDENT VARIABLE | CONTROLLED VARIABLES | COEFFICIENT FOR RACE |
|---|---|---|
| FIRST EVALUATION | (A) EXPERIENCE AT HIRE | –34.37 |
| | (B) GRADE AT HIRE | |
| SECOND EVALUATION | (A) AND (B) | –39.91 |

P-x 28.

29. The data are summarized in the following table:

PROMOTIONS AND COMPENSATION, BY RACE

| | NON-BLACKS | BLACKS |
|---|---|---|
| AVERAGE ANNUAL INCREASE IN GRADE | .53 | .18 |
| AVERAGE ANNUAL INCREASE IN SALARY | 14.9 % | 12.0 % |
| AVERAGE FINAL GRADE | 5.29 | 4.13 |
| AVERAGE FINAL SALARY/MONTH | $917.15 | $861.47 |

P-x 29.

30. These analyses are summarized in the following table:

PROMOTION AND COMPENSATION REGRESSIONS

| DEPENDENT VARIABLE | CONTROLLED VARIABLES | COEFFICIENT FOR RACE |
|---|---|---|
| AVERAGE ANNUAL INCREASE IN GRADE | (A) EDUCATION (B) FIRST GRADE DURING CLASS PERIOD | –.6 *** |
| FINAL GRADE | EDUCATION | –1.22*** |
| FINAL GRADE | EXPERIENCE AT FINAL DATE | –1.21*** |
| FINAL GRADE | (A) EDUCATION (B) EXPERIENCE AT FINAL DATE (C) FIRST EVALUATION | –1.38*** |
| FINAL SALARY | (A) EDUCATION (B) EXPERIENCE AT FINAL DATE (C) FIRST EVALUATION (D) SECOND EVALUATION (E) MIDPOINT OF SALARY RANGE PER FINAL GRADE | –$45.98* |

\* —Statistically significant at .05.
\*\*\*—Statistically significant at .001.

P-x 30.

31. During the certification hearing, appellee offered a statistical expert who presented a model, developed through a multiple regression analysis, of employee salaries. Using current white salaries as the dependent variable, the statistician first developed a model that would predict the salaries of whites given the following variables: the employee's tenure, job grade, and date of departure. The data were then plotted on a graph, with actual salary on the x-axis and "residual"—the difference between the actual salary and the predicted salary—on the y-axis. The

Appellant's expert summarized his findings as follows:

[There] are race-related differences, most of them significant in all of those variables, both in the hiring part and in the treatment of present employees.... You get a consistent pattern of race-related differences, depending on how many people you have and what the—the number of characteristics you are talking about. Sometimes it is stronger than others, but it is very, very consistent in one particular direction.... *And, frankly, I think that that consistency is about equal or more important than any single figure or the significance levels.*

Rec. Vol. V at 175–176 (emphasis added).

On the basis of appellant's statistical evidence, and because of appellee's failure to rebut that evidence either by a direct attack on the statistics or by other means, I conclude that appellant has proved the existence of a pattern and practice of racial discrimination in the employment practices of appellee Ft. Worth Bank & Trust.

*Individual Claims*

In light of a finding of class-wide disparate treatment, I would hold that the district court erred in considering appellant's individual claim in the evidentiary framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny.[32] When an individual proves discrimination against a certified class of which she is a member, her individual claim proceeds in a different posture.

The establishment of liability on the class claim operates to establish a prima facie case on behalf of each member of the class. Once the individual plaintiff proves that he applied unsuccessfully, the burden shifts to the employer to establish that its failure to hire that individual was the result of legitimate nondiscriminatory reasons.

*Phillips v. Joint Legislative Committee, Etc.,* 637 F.2d 1014, 1031 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). *See also Payne v. Travenol,* 673 F.2d at 818; *Craik v. Minnesota State University Board, supra,* 731 F.2d at 469–71.

A defendant against whom a finding of class-wide discrimination has been entered finds itself in the position of a "proved wrongdoer," and therefore no longer enjoys the presumption that its decisions were free of discriminatory intent. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 1867 n. 45, 52 L.Ed.2d 396 (1977). In fact, the presumption is that all the defendant's decisions were tainted by discriminatory intent. *Id.* at 1868. Thus, it is not suffi-

residual values ranged from −180 (indicating an actual salary $180 less than the predicted salary) through zero (where actual salary equals predicted salary) to + 180. Horizontal lines were drawn at zero—to represent the expected value—and −150 and + 150—to represent two standard deviations. The plotted data fell randomly on either side of the zero line and generally within the lines representing two standard deviations. The distribution indicated that the graph accurately predicted white salaries.

The next step in the analysis was to see whether the white model would predict black salaries to a statistically significant degree. The data points all fell within two standard deviations of the expected value. From this, the appellee's expert concluded that the graph described a situation where race was not a factor. Rec.Vol. III at 232.

I would not consider this evidence sufficient to rebut appellant's showing for the following reason: All but two of the eleven data points for blacks fall below the expected value. In fact, the average residual value for blacks is −37.64, while the average for whites is, by definition, zero. Thus, appellee's own model shows that blacks received on average $37.64 per month less than whites, which tends to corroborate rather than rebut appellant's finding that blacks received $45.98 less than whites. While each individual data point might fall within two standard deviations of the expected value, this result fails to rebut appellant's evidence because the data points are skewed towards the low end of the scale. In fact, appellee's expert's only comment on this distribution was a less than ringing endorsement: "Well, the data is not clearly normal, but, then, again, it is not clearly non-normal." *Id.*

32. *See, e.g., Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

cient, as it was in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978), that the employer merely "articulate some legitimate, nondiscriminatory reason for the employee's rejection," nor may the defendant escape, as in *Burdine*, 101 S.Ct. at 1094, without "persuad[ing] the court that it was actually motivated by the proffered reasons." On the contrary, the employer "has the burden of *proving* that the individual claimant was denied an employment opportunity for legitimate reasons." *Richardson v. Byrd, supra*, 709 F.2d at 1021. *See also, Phillips v. Joint Legislative Committee, supra* (employer must affirmatively establish that its decision *"was the result of* legitimate reasons") (emphasis added); *Craik v. Minnesota State University Board, supra*, 731 F.2d at 470 ("In pattern or practice cases, however, the presumption shifts to the employer not only the burden of production, but also the burden of persuading the trier of fact that it is more likely than not the employer did not unlawfully discriminate against the individual.") (footnote omitted). I would remand appellant's individual claim so that it may be considered in this framework.

*Conclusion*

This case should have been a reminder that discrimination need not manifest itself through the spoken word in order to exist. While the absence of the "smoking gun" might now be rare, *but see, e.g., Sylvester v. Callon Energy Services, Inc.*, 781 F.2d 520, 521 (5th Cir.1986) (employer "wasn't sleeping with no nigger"), Title VII allows plaintiffs to seek redress from discrimination that operates covertly as well as overtly. While still waters run deep, this case should have shown that they are not necessarily pure.

Instead, the majority has shown that this circuit has learned the lesson of *Falcon* too well. Although *Falcon* is not a funeral pyre for broad class actions, the majority has chosen to place yet another stumbling block in the path of those who have long been denied justice. I have no doubt that the majority's opinion will be used, as it has been here, repeatedly to strike down and discourage legitimate claims. The clock may be turning back, but let us at least stay its hands a little longer to forestall the bleakness that seems apparent on the horizon.

The district court erred in failing to find racially disparate treatment against the proper class of applicants and employees, and I would accordingly reverse and remand for appropriate relief.